(No. 47100.-)

M.W.M. TRUCKING CO. *et al.,* Appellees, v. THE INDUS-
TRIAL COMMISSION *et al.*—(Donald Ivester, Appel-
lant.)

*Opinion filed January 26, 1976.*

CREBS, J., took no part.

Edward F. Brennan, Jr. and David J. Letvin, of Cohn, Carr, Korein, Kunin & Brennan, of East St. Louis, for appellant.

Charles W. Hendrix, of Champaign, for appellee M.W.M. Trucking Co.

Robert L. Mueller, of Livingstone, Mueller, Drake and Davlin, of Springfield, for appellee American Transit Lines, Inc.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Claimant, Donald Ivester, filed an application for adjustment of claim before the Industrial Commission seeking an award for injuries he sustained when the truck he was driving collided with another vehicle near Springfield, Illinois, on Monday, February 1, 1971. The arbitrator entered an award on behalf of claimant for temporary total incapacity, permanent facial disfigurement and medical services. The arbitrator found that M.W.M. Trucking Co. (M.W.M.), as the borrowing employer, was principally liable for payment of the award. It was further determined that American Transit Lines (American), as the loaning employer, would be liable should M.W.M. fail to satisfy the award. However, the arbitrator declined to determine the relative rights between M.W.M. and American to reimbursement or indemnification of each for payment of the award. The Industrial Commission confirmed the award, but on *certiorari* to the circuit court of Sangamon County the award was reversed. The principal issues raised in the direct appeal concern the jurisdiction of the Industrial Commission to determine this cause, the question of whether claimant was an independent contractor at the time of the accident, the status of M.W.M. as a borrowing employer, the amount of the award, and the issue of whether M.W.M. or American is primarily liable should an award be sustained.

Claimant, an Illinois resident, entered into an agreement to lease his truck to American. Claimant's payment was determined by the amount of freight he handled. In return American supplied claimant with Interstate Commerce Commission approval to operate the vehicle. American also provided claimant with liability insurance, and it withheld taxes and social security contributions from his pay. The agreement recited that use of the equipment without American's express consent would place the activity outside the scope of the agreement and render the

agreement inoperative. Claimant also agreed to pay American all monies he collected.

American's main terminal was located in Chicago. Claimant's normal itinerary consisted of hauling freight between Chicago and St. Louis, Missouri. American also maintained a terminal in Granite City, Illinois, which is in close proximity to St. Louis. Claimant resided near Granite City.

After discharging cargo at the Granite City terminal, a driver would normally inform Bud Arnold, American's dispatcher at this facility, that he was available to haul freight north to Chicago. A driver's name would be placed on a board, and he would be assigned on a "first-in, first-out" basis. The record establishes that most of American's freight business consisted of shipment of cargo southbound from Chicago. Unless a driver obtained cargo being shipped northward, he would "deadhead," i.e., return empty, to Chicago with a resulting loss in pay. To avoid this situation, American's drivers who were not assigned northbound cargo by 3 or 4 p.m. were given permission to obtain a "trip lease." A "trip lease" was common practice in the trucking industry whereby a lessor would lease the vehicle to another company for a single trip to a specified designation. The Granite City dispatcher had authority to permit this practice and he would then notify American that a driver was returning with cargo.

Claimant testified that he arrived at the Granite City terminal on January 29, 1971, discharged his cargo and inquired as to northbound freight. He said American did not have any cargo that would be assigned to him. Therefore about noontime he asked and received permission from the dispatcher to "trip lease" for M.W.M., as he had done on numerous occasions.

M.W.M. is a trucking firm incorporated in Missouri with its principal place of business in Arcadia, Missouri. Most of its cargoes are destined for the Chicago area. Claimant said he traveled to Arcadia on January 29,

arriving in the evening. He signed a "trip lease" agreement with M.W.M. for transporting lumber from Missouri to Whiting, Indiana, which is located in the Chicago area. Evidence established that the prevailing industry custom permitted a driver to sign the "trip lease" on behalf of the employer lessor. The agreement named claimant and American as lessor of the vehicle. In consideration for 75% of the freight revenue, lessor agreed to transport said property, although the agreement did not contain any specific date or time for delivery. The remaining 25% was payable to M.W.M., who, as lessee, agreed to assume full operational control and responsibility for the equipment, including display of appropriate Interstate Commerce Commission signs. The lessor, however, was to pay the driver's salary, compensation coverage, all taxes, and necessary operating expenses, such as fuel and maintenance.

Claimant obtained a cargo of lumber from M.W.M. in Missouri. He drove to his home in Illinois for the weekend. He left for Whiting, Indiana, the following Monday, the day the accident occurred.

Fourteen checks were introduced into evidence that had been issued by M.W.M. for "trip leases" entered into with claimant commencing in 1968 until December, 1970. M.W.M. had sent these checks to claimant as he had specified. Twelve checks were made payable solely to American, and two checks were made payable to American and claimant. All bore the purported endorsement of American. The record establishes that claimant, without knowledge of American, had endorsed the checks in the latter's name and retained the proceeds therefrom. Claimant explained that he had never been told not to act in this manner. The testimony of the manager of M.W.M. indicated that it was an industry custom for a driver to endorse a check on behalf of his company.

Claimant said that American knew of the "trip leases" with M.W.M. because he would record this activity in his

log records. Claimant asserted that he submitted log copies to American detailing his activities as required by the Interstate Commerce Commission.

Robert Wendorf, the operational director of American, had reviewed all logs submitted by claimant from mid-1969, and he testified that he was unable to discover any notation on these documents indicating claimant had entered into a "trip lease" with M.W.M. and such knowledge was not obtained until after claimant's accident. Prior log records had been destroyed. Wendorf testified that a driver was required to turn in a daily log even if he was not working. Wendorf also said American could derive a benefit by having trucks available in Chicago and it therefore permitted its dispatcher in Granite City to augment ("trip lease") its vehicles. The dispatcher would inform American of the "trip lease," and American would then notify the company by letter to send it a check in payment thereof. American, however, had not sent a letter to M.W.M. regarding payment. Therefore the industry custom would permit payment directly to a driver. But even though payment was directly made to claimant, Wendorf asserted that the logs should have revealed the "trip leases" for M.W.M. and it was not until after the accident that this witness knew of the existence of said company.

Wendorf also detailed American's policy to deduct 5% from the "trip lease" payment for administrative expenses it incurred for this activity. This policy was instituted in the latter part of 1970. While claimant had not paid this percentage to American for any "trip lease" with M.W.M. prior to his accident, the record substantiates that claimant had entered into only one "trip lease" with M.W.M. which would have required the 5% deduction.

On review before the Commission the owner of M.W.M., Marvin Walker, disclaimed that his company instructed claimant that the latter must adhere to a specific route, and claimant admitted that he chose the

destination route. M.W.M. possessed the original of claimant's log records that were written on American's log books indicating the "trip leases." There was no indication as to the disposition of the copies of these records.

Bud Arnold disclaimed knowledge of M.W.M. He had no recollection of releasing claimant to drive for that company or seeing claimant's log records indicating such "trip leases." Arnold said it would be unusual to allow a driver to seek a "trip lease" at noontime. Arnold conceded that he would orally release drivers to "trip lease." He said some drivers would not seek permission; rather they would merely leave to obtain the work.

Dr. Albert Kwedar, a general surgeon in the Springfield area, had treated claimant after the accident. The parties stipulated to his qualifications. Dr. Kwedar interpreted two X rays indicating claimant had suffered an undisplaced (incomplete) fracture of the distal end of the fibula near the right ankle and a fracture in the right lateral process at the sixth cervical vertebra. Dr. Kwedar explained that the latter fracture did not involve the vertebra. He was of the opinion that there might be some permanent condition relating only to the injury of claimant's neck. The record further establishes that certain medical bills sustained by claimant as a result of the accident were not paid.

Claimant described his injuries as consisting of multiple contusions and several fractures including a broken ankle. He said that he experienced soreness in his neck, and he could walk without a limp "most of the time." It was determined that several months after the accident claimant returned to his employment.

The threshold consideration presented for determination concerns the authority of the Illinois Industrial Commission to adjudicate claimant's request for compensation. Assuming *arguendo* that claimant was employed by M.W.M. at the time of the accident and citing certain provisions of the Missouri compensation statutes (Mo. Rev.

Stat., secs. 287.060, 287.110 (1969)), M.W.M. says that Missouri law afforded claimant an exclusive remedy for his injuries. M.W.M. appears to suggest that this right to recovery under Missouri law, when considered with the factors that the "trip lease" agreement was made in that State and that the ultimate destination was Indiana, precludes application of the Illinois Workmen's Compensation Act because Illinois has no substantial connection with the relationship of M.W.M. and claimant.

Relying upon the title of the Workmen's Compensation Act and this court's decisions in *Arnold v. Industrial Com.* (1960), 21 Ill.2d 57, and *McLain Dray Lines v. Industrial Com.* (1969), 41 Ill.2d 554, claimant maintains that the Illinois Industrial Commission had authority to adjudicate his claim. The title to the Workmen's Compensation Act reads:

> "An Act to promote the general welfare of the people of this State by providing compensation for accidental injuries or death suffered in the course of employment within this State, and without this State where the contract of employment is made within this State; providing for the enforcement and administering thereof, and a penalty for its violation, and repealing an Act therein named." Laws of 1951, p. 1060.

Claimant interprets *Arnold* and *McLain* to preclude consideration of a compensation claim when the situs of the accident is Illinois only when both the employer and employee are not Illinois residents; the employer's place of business is not located in Illinois; and the employment contract is not made in Illinois. Claimant asserts that his Illinois residence taken in conjunction with the situs of the accident allows adjudication of his claim under Illinois law.

In *Arnold* and *McLain* this court held that the mere situs of the accident in Illinois is insufficient to confer jurisdiction. There must be "some connection between Illinois and the employment relationship"; and, if the contract for employment is not made in Illinois, workmen's compensation coverage is not afforded a nonresident

employee of a foreign employer who is injured in this State. (*Arnold v. Industrial Com.* (1960), 21 Ill.2d 57, 61.) A State interest in the employment relationship or incidents thereto must exist. One commentator has remarked that the State of an employee's residence alone has never been held to entitle implementation of that State's compensation statute although this is one of the factors in determining the applicability of the law of a particular State. 3 A. Larson, The Law of Workmen's Compensation, secs. 86.10, 87.60 (1973).

M.W.M. has placed undue emphasis on the fact that the "contract for hire" with claimant was entered into in Missouri. The place where the employment contract is made is the crucial jurisdictional consideration in situations where the accident occurs outside of Illinois. (*Morris v. Industrial Com.* (1973), 55 Ill.2d 563.) This is not the situation presented in this case.

The record discloses that claimant is a resident of this State and permitting jurisdiction of the Illinois compensation act to accrue to him would "promote the general welfare of the people of this State" as expressed in the title of the act. Moreover, the accident occurred in this State and M.W.M. conducted a substantial portion of its business in the Chicago area. These cumulative circumstances establish a substantial interest of this State in the employment relationship. We conclude that the Industrial Commission properly considered claimant's application for adjustment of claim. 3 A. Larson, The Law of Workmen's Compensation, sec. 86.10 (1973).

M.W.M. contends that, as a matter of law, claimant was an independent contractor and not its employee at the time of the accident. American appears to agree with this position. It has often been stated that the question of whether one is an employee or independent contractor is dependent upon the facts of each case, but the right to control the work is of substantial importance. (*Clark v. Industrial Com.* (1973), 54 Ill.2d 311, 314-15; *Bauer v.*

*Industrial Com.* (1972), 51 Ill.2d 169, 171-72.) The Industrial Commission's determination that a claimant is an employee will not be set aside unless contrary to the manifest weight of the evidence. *Morgan Cab Co. v. Industrial Com.* (1975), 60 Ill.2d 92, 101.

By the terms of this "trip lease" agreement M.W.M., as lessee, agreed to assume "full responsibility in respect to the equipment it is operating, to the public, the shippers, and the Interstate Commerce Commission." The lessor (American and claimant) surrendered full control of the equipment to M.W.M. and agreed to "operate said equipment as directed by Lessee." M.W.M. further reserved the right to transfer the cargo from claimant's truck to another if the vehicle became mechanically unsound or was deemed inadequate by M.W.M. with a necessary diminution from the amount owed the lessor. It would appear that such provisions would require M.W.M. to assume complete authority for operational control of the shipment under Federal law. *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.* (1975), —— U.S. ——, ——, 46 L. Ed. 2d 169, 176, 177, 96 S. Ct. 229, 234, 235.

We believe these contractual provisions render the present case sufficiently dissimilar to the facts set forth in *Bauer v. Industrial Com.* (1972), 51 Ill.2d 169, upon which M.W.M. principally relies, and that decision is not controlling. The record presents an arguable question of fact as to whether claimant was an employee of M.W.M., and we cannot say the decision of the Industrial Commission was contrary to the manifest weight of the evidence.

M.W.M. questions whether claimant was a loaned employee. In *American Stevedores Co. v. Industrial Com.* (1950), 408 Ill. 449, 454, this court described such employee as one who is loaned by his general employer to another for the performance of a specific service. The existence of a loaned-employee relationship involves consideration of many factors and generally presents a factual

evaluation, as here, to be determined by the Industrial Commission. (*M. & M. Electric Co. v. Industrial Com.* (1974), 57 Ill.2d 113, 117.) The Industrial Commission sustained the arbitrator's findings that M.W.M. was a borrowing employer, and M.W.M. does not advance a compelling basis requiring a reversal thereof.

American seeks to avoid potential liability for payment of an award, contending claimant violated his contract with American and he cannot therefore claim any benefits from American. This contention is based on American's assertion that it did not receive information at any time from claimant that he entered into "trip leases" with M.W.M. and therefore it could not expressly consent to such arrangement as required by its employment contract with claimant. American also suggests that claimant's failure to remit 5% of the "trip lease" proceeds is indicative of claimant's deceptive intent to conceal his employment with M.W.M. We believe this argument is resolved basically upon the credibility of the various witnesses, and the Industrial Commission's resolution will not be set aside unless contrary to the manifest weight of the evidence. *Newgard v. Industrial Com.* (1974), 58 Ill.2d 164, 169.

Claimant asserted that the log records he was required to make and submit to American indicated his "trip leases" with M.W.M. Robert Wendorf, American's operational officer, denied that its records revealed these journeys. Yet Marvin Walker, the owner of M.W.M., testified he had the original of claimant's logs indicating the "trip leases" with M.W.M. and these were compiled on American's log books. Walker further said that the company entering into the trip lease with a driver would obtain the original log record and the copy would be given to the driver's normal employer. It does not appear that the log records were submitted into evidence to refute claimant's assertion. Similarly, American's assertion that its dispatcher had not known of M.W.M. and inferentially

that it therefore did not grant permission to enter into the "trip lease" is subject to the same determination of credibility. Finally, the claim that 5% of the amount paid for the "trip lease" was not forwarded to American is not persuasive. Wendorf testified that this reimbursement policy to American was initiated during a time when claimant made only one "trip lease" arrangement with M.W.M. Any inference of improper activity on the part of claimant in endorsing the checks on behalf of American is dissipated by the testimony of the office manager of M.W.M. who testified that such practice was common throughout the trucking industry. The Industrial Commission's determination as to the credibility of the witnesses was not improper.

Moreover, the evidence also establishes that industry custom allowed truck drivers to "trip lease" and American permitted this activity. It also appears American derived some benefit from the practice by making it economically practical for its truck drivers to return to the Chicago area more rapidly so they could transport cargo for American. See *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.* (1975), ——— U.S. ———, ———, 46 L. Ed. 2d 169, 176, 96 S. Ct. 229, 233.

Even if it were to be assumed claimant had not obtained the express consent of American in reference to his "trip leases" with M.W.M., such contractual infraction might not result in exempting American from potential liability for workmen's compensation for this accident. The thrust of American's argument suggests that claimant was operating outside the scope of his employment when he accepted the "trip lease" with M.W.M. without American's express consent thereto. See discussion 1 Angerstein, Illinois Workmen's Compensation, secs. 441-44 and 447-49 (rev. ed. 1952).

In the present case the testimony of American's dispatcher, Bud Arnold, established that many drivers would not seek express permission before attempting to

obtain "trip leases," and this would imply that American was aware of the practice. Also, there is no evidence that American made any attempt to enforce the contractual provision upon which it now relies. In fact it may be inferred that American was not disturbed with claimant's alleged contractual violation, for both parties entered into a new contractual arrangement after claimant recovered from his injuries and procured new equipment about six months after the accident. As heretofore noted American obtained benefits from the custom of "trip leasing" by its drivers. Under such circumstances the reasonable conclusion arises that American acquiesced in the practice of its drivers entering into "trip leases" without its express consent.

In *Northwestern Steel & Wire Co. v. Industrial Com.* (1967), 38 Ill.2d 441, 445, this court reiterated the view that an employee whose customary action resulted in a breach of an employer's rule of which the latter knew and which it did not enforce would not necessarily preclude recovery. We believe the facts of this case place it within the discussion in the *Northwestern Steel* case, and claimant's actions in not obtaining American's express consent to the "trip lease" with M.W.M. would not require reversing the Industrial Commission's determination of liability against American in this instance.

Claimant advances several contentions regarding the propriety of the award entered by the Industrial Commission. Claimant maintains that the Industrial Commission did not award him sufficient payment for medical expenses incurred from the accident. It would appear that the arbitrator only awarded claimant payment for ambulance service. Various other bills for medical services totaling in excess of $2,000 were admitted into evidence, and Dr. Kwedar testified the amounts were reasonable for the services rendered. Neither M.W.M. nor American now expressly disputes the necessity for such services or the amounts owed.

Section 8 of the Workmen's Compensation Act requires the employer to provide an injured employee with necessary medical services. (Ill. Rev. Stat. 1971, ch. 48, par. 138.8(a).) It would seem the Industrial Commission's failure to grant such payment was error requiring that the Industrial Commission reconsider the matter.

Claimant further says his testimony that he occasionally limped undisputedly establishes the permanent partial loss of use of his right leg due to the undisplaced fracture he sustained in the collision. We note that Dr. Kwedar expressed the opinion that the only skeletal injury which could give rise to a permanent condition involved claimant's neck. Under such circumstances the failure of the Industrial Commission to render the award sought by claimant was proper.

Claimant also maintains that the Industrial Commission failed to grant him an award for 30 weeks additional compensation for the fracture of the process of the sixth cervical vertebra. As relevant to this contention, section 8(d) allows payment of this amount for an injury resulting "in a fracture or fractures of one or more spinous or transverse processes ***." (Ill. Rev. Stat. 1971, ch. 48, par. 138.8(d).) Dr. Kwedar interpreted claimant's X ray as disclosing "a fracture in the cervical spine of the right lateral process at the sixth cervical vertebra." A lateral process is synonymous with a transverse process. 2 Schmidt, Attorneys' Dictionary of Medicine, V—39 (1975).

M.W.M. does not contest the applicability of section 8, but it suggests the medical evidence does not support claimant's argument. However, the uncontradicted testimony of Dr. Kwedar concerning his interpretation of this X ray establishes this injury, and the failure of the Industrial Commission to grant claimant an award was contrary to the manifest weight of the evidence. *Kerz v. Industrial Com.* (1972), 51 Ill.2d 319, 322.

M.W.M. maintains that if claimant was a loaned

employee, then under the circumstances of this case American is liable for payment of the award. M.W.M. relies upon section 1(a)(4) of the Workmen's Compensation Act (Ill. Rev. Stat. 1971, ch. 48, par. 138.1(a)(4)) and that portion of the "trip lease" agreement stating that the lessor was to pay the driver's compensation coverage.

In *Chicago's Finest Workers Co. v. Industrial Com.* (1975), 61 Ill.2d 340, we had occasion to interpret section 1(a)(4) of the compensation statute. We there held that the borrowing employer (M.W.M.) is liable to pay the compensation award. If the borrowing employer does not pay the award, the loaning employer (American) is to pay with the right of reimbursement from the borrowing employer.

We express no opinion as to the effect of the provision in the "trip lease" agreement upon a claim by M.W.M. for reimbursement of amounts which it is liable to pay. Such determination may be made in a subsequent proceeding.

Accordingly, the judgment of the circuit court of Sangamon County is reversed and that court is directed to enter an order remanding this cause to the Industrial Commission. The award heretofore entered shall be modified to include payment of claimant's medical expenses and an award for the fractured transverse process sustained in the accident.

*Reversed and remanded, with directions.*

MR. JUSTICE CREBS took no part in the consideration or decision of this case.