(No. 47915.-

TERRY CARTER, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*—(Clark Oil and Refining Corp., Appellee.)

*Opinion filed May 28, 1976.*

David J. Letvin and Edward F. Brennan, Jr., of Cohn, Carr, Korein, Kunin & Brennan, of East St. Louis, for appellant.

Keefe and De Pauli, of East St. Louis, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

This workmen's compensation appeal comes here pursuant to our Rule 302(a) (Ill. Rev. Stat. 1973, ch. 110A, par. 302(a)). It involves a single issue: Whether an Industrial Commission affirmance of an arbitrator's decision that no employer-employee relationship existed between claimant, Terry Carter, and respondent, Clark Oil & Refining Corp. (the Company), was contrary to the manifest weight of the evidence. The circuit court of Madison County held it was not.

On July 31, 1970, claimant, Terry Carter, operated a Clark Oil & Refining Corp. filling station in Collinsville which he leased from the Company. While changing a sign advertising the price of gasoline, he stepped off a ladder into a small hole and broke his ankle. Apparently the original lease was for a one-year term commencing January 8, 1968, and terminating January 7, 1969. A second lease, commencing January 8, 1969, and expiring January 7, 1970, was executed by the parties. Both leases provided they continued from year to year thereafter. Claimant apparently was to receive an agreed amount, referred to at one point as 5 or 6 cents per gallon and later as 6 or 7 cents per gallon, from the price of each gallon of gasoline sold by him. He was to pay respondent 1½ cents per gallon as rent for the station premises, with a minimum daily

rental of $10, to be remitted to respondent each day by cashier's check, certified check or bank money order accompanied by forms supplied by respondent. The station was to be open 24 hours per day; if it was not, lessor could, by written notice, increase the gallonage rental and minimum rental by 50% for the entire month in which such breach occurred. Underground storage tanks were to be used exclusively for gasoline and petroleum products supplied by the Company, and breach of that covenant was stated to be grounds for immediate termination of the lease by lessor. No additions, improvements, alterations or structural changes in the premises could be made without mutual consent. Lessee was obligated to maintain the station in good repair and to pay all operating expenses except real estate taxes and water and electricity charges. He was exclusively liable for workmen's compensation and unemployment insurance and for social security taxes on his employees. Liability insurance in specified minimum amounts, and naming the Company as an additional insured, was to be secured and kept in force by him, and he agreed to indemnify the Company for personal injury or property damage losses resulting from the operation of the leased premises. Other provisions negated any control on the Company's part of the claimant's business, "the entire control and direction of the activities of the business carried on within said premises shall be and remain" with claimant as long as he complied with the lease provisions, and claimant was to post signs on the premises advising the public that the business was owned, operated and maintained solely by him. Lease termination provisions gave claimant the right to terminate it at any time on 30 days written notice, whereas the Company's right to terminate without cause could be exercised on like notice only at the end of any yearly term. In the event of the happening of specified events, including the station remaining closed for 48 successive hours, the lessor could terminate the lease

without notice and reenter the premises; defaults other than those enumerated, together with a failure to remedy the default within 10 days after lessee received written notice from lessor, permitted termination and reentry by lessor.

At the same time the leases were executed, the parties also entered into a "Retail Dealer Consignment Agreement." It obligated the Company to deliver such quantities of gasoline as the claimant required and provided he would handle Clark gas, advertise it, and maintain the Company names and trademarks on the pumps and equipment; he agreed to furnish, maintain and operate the facilities and equipment, and to hire and pay such employees as he deemed necessary or desirable who were to be under his sole direction and control. The consignment agreement also contained provisions similar to those in the lease relating to workmen's compensation insurance, social security and income taxes, etc. Gasoline delivered by the Company was described as consigned to claimant and remaining the property of the Company until sold to the retail customers; Company portions of the proceeds of sales were to be held in trust by claimant and remitted daily to Clark by cashier's check, certified check or money order. Other clauses provided claimant's margin on gasoline sales should never be less than 3 cents per gallon, and placed all risk of robbery or holdup loss on claimant, together with liability for disappearance, loss or damage to gasoline products.

The consignment agreement provided for its continuance from year to year subject to cancellation by either party at the end of any year upon 30 days written notice; immediate termination was provided for if consignee lost the legal right to occupy the premises, and revocation and termination by consignor were authorized if the consignee breached the agreement.

Claimant testified that in July, 1969, he was told by the Company that he "was making too much money" and

that he "had to sign" a release of the current lease and agreement and enter into new ones providing a lower margin of profit. He signed the surrender and executed a new lease and consignment agreement covering the period from July 29, 1969, to January 8, 1970, and continuing from year to year thereafter. The old and new leases do not differ significantly except that the rent for the premises, specified in the new lease, was reduced from 1 1/2 cents to 1 1/10 cents per gallon and an added provision required any modification of the lease terms to be in writing and signed by the Company's marketing vice-president in order to bind the Company. The paragraph guaranteeing the lessee a minimum margin of 3 cents per gallon was omitted from the consignment agreement, and a new provision added granting the Company a security interest in claimant's stock in trade to secure payment of his indebtedness or obligations to it. There is nothing in this record to indicate with any certainty what margin of profit per gallon was actually agreed upon under this lease or whether claimant's net profit from operating the station under the new lease and agreement increased or diminished.

Claimant testified that he repeatedly requested a copy of the new lease but never received one; that he was told "We will have you in for a review." As a result, he stated, he did not consider that he was operating under a lease at the time he was injured but was on "borrowed time." Despite this testimony, it seems clear that the automatic renewal provision of the lease would operate to extend it until claimant terminated his relationship with the Company on June 18, 1971. He terminated, he testified, because "I was having trouble with my foot and couldn't keep on it." At that time he and the Company executed a lease surrender agreement similar to that executed in July of 1969.

Claimant urges that, despite the provisions of the lease and agreement, the Company actually controlled in detail

the operation of the station. Illustrating that theory, he argues, is his testimony that a Company salesman, Bill Wicks, stopped at the station from time to time to check the "midnite crew" and that claimant discharged two such employees at the request of Wicks, who said one had been drinking and the other carried more pocket money than Company policy approved; that the Company compelled him to sell only Pepsi-Cola although he had previously sold Coca-Cola and 7-Up in addition, and that he sometimes was required to sell the Pepsi-Cola at a loss; that he was required to sell other items including stuffed toys, records, and various holiday items whether he wanted to or not—"they [the Company] had an undertone of you would or else"; that he had to discontinue selling one brand of charcoal and accept from the Company another which sold at a higher price; that he was told when to paint the station and had to buy Company paint; and that the Company dictated the type and colors of the uniforms worn by the station attendants and required that certain employees cut their hair and moustaches or be fired. Prices were fixed by the Company, which specified the types of advertising signs and times to change them. Claimant was required to attend Company business meetings every three or four months, the exact nature of which is not apparent from the record. Also, claimant testified, he had to stop giving trading stamps because a new Clark station was opened in town; that he was required by the Company to buy and plant flowers and that the Company representatives frequently inspected the station and rest rooms and told him what changes to make.

Terry Ostendorf, the only other witness, testified he had been a Company salesman or territorial manager from March 15, 1970, to April 30, 1972, and supervised Carter's station, auditing it, inspecting it, delivering promotional items and explaining Company policy. He suggested prices at which items should be sold and stated that dealers, including Carter, did not always follow the suggestions.

Ostendorf thought Carter understood his lease was automatically renewable; he agreed that Carter had requested a copy of the last lease and stated the office had been requested to send Carter one but did not. Ostendorf also testified that he had never requested that a dealer discharge an employee, but "I have heard of it happening. I do not know it as a fact"; that in his territory nothing happened if a dealer did not follow Company suggestions and that, with reference to the trading stamps, his recollection was that both Collinsville stations were giving triple stamps on Tuesdays and he requested both to follow Company policy of only double stamps on Tuesday. The general tenor of his testimony was that the Company believed uniform prices at Clark stations attracted customers and increased sales; that this policy was explained by the Company representatives to the dealers and suggestions made as to the items to be handled and prices at which they were to be sold; that, while such suggestions were not always followed, a steadfast refusal to follow Company policies could result in termination of a lease.

While this court has not passed directly upon the question whether a filling station operator is an employee, within the meaning of workmen's compensation statutes, of the company whose products he sells, there are numerous cases in other jurisdictions involving that issue. Many of those cases are referred to by Professor Larson in discussing the independent contractor-employee question (1A A. Larson, The Law of Workmen's Compensation, secs. 44.33 through 44.35). He characterizes the filling station cases as "among the most complex and evenly balanced." He adds, however, that "an analysis will show that the most reliable test that recurs in the decisions is the distinction between operators who have no lease and are subject to being 'fired' on short notice, and operators who either have a lease or are secure in their contractual right to continue in the business for a specified time." (Sec. 44.35 (footnotes omitted).) The accuracy of that observa-

tion is apparent from the cases cited by claimant, where, generally speaking, operators whose tenure was not terminable at the will of the company were not considered to be employees. (See, *e.g., Texas Co. v. Wheat* (1943), 140 Tex. 468, 168 S.W.2d 632; *Dawson v. Clark Oil and Refining Corp.* (Mo. App. 1966), 410 S.W.2d 353; *Carter v. Martin Petroleum Co.* (Ky. App. 1970), 460 S.W.2d 810; *Shell Oil Co. v. Leftwich* (1972), 212 Va. 715, 187 S.E.2d 162.) Conversely, where the operator was clearly subject to detailed company control or the relationship terminable at the will of the company, an employer-employee relationship was held to exist. See, *e.g., Swift v. Aetna Casualty and Surety Co.* (Tex. Civ. App. 1970), 449 S.W.2d 818; *Bieluczyk v. Crown Petroleum Corp.* (1948), 134 Conn. 461, 58 A.2d 380; *Joiner v. Sinclair Refining Co.* (1934), 48 Ga. App. 365, 172 S.E. 754.

In discussing the independent contractor-employee dichotomy we said in *Morgan Cab Co. v. Industrial Com.* (1975), 60 Ill.2d 92, 97-98:

"There is no inflexible rule applicable in all situations to determine whether one is an employee or has some other status. *O'Brien v. Industrial Com.,* 48 Ill.2d 304, 305.

In *Lawrence v. Industrial Com.,* 391 Ill. 80, where the issue was whether the claimant was an independent contractor or an employee, this court said:

'The existence of the master and servant relationship is primarily, in any given case, a question of ultimate fact, involving in its determination a conclusion derived from a consideration of all the evidentiary facts disclosed by the evidence, in connection with the application of principles of law to the consideration of the evidence. [Citations.]

The rule is well settled that it is the province of the Industrial Commission to

draw reasonable inferences and conclusions from evidentiary facts, and the courts are not privileged to set aside the findings of the commission unless they are manifestly against

the weight of the evidence. [Citations.] ' 391 Ill. 80, 84.

\* \* \*

No one factor may determine what the relationship is between parties in a given case. It may be necessary to consider a number of factors with evidentiary value, such as the right to control the manner in which the work is done, the method of payment, the right to discharge, the skill required in the work to be done, and who provides tools, materials, or equipment. Of these factors the right to control the manner in which the work is done is the most important in determining the relationship. *Greenberg v. Industrial Com.*, 23 Ill.2d 106; *Henn v. Industrial Com.*, 3 Ill.2d 325; see also Weidner, *The Workmen's Compensation Act,* 1967 U. Ill. L.F. 21, 24-25."

Claimant referred in oral argument to two of our recent opinions, *Schroeter v. Industrial Com.* (1976), 62 Ill.2d 284, and *Fire King Oil Co. v. Industrial Com.* (1976), 62 Ill.2d 293, both of which involve workmen's compensation claims by filling station managers. In neither case, however, was the employee's status as such in issue, nor is there any reference to the terms of employment. Neither case is authority for claimant's position here.

Professor Larson also points out in section 46.00: "Whether the deliberate substitution of the independent contractor for the employee relation is effective to avoid compensation liability depends on whether the actual facts of the relationship, as distinguished from the legal name and form given it, are shown by the parties' contract and conduct to constitute independent contractorship." Claim-

ant argues, as earlier indicated, that the degree of Company supervision and direction of the actual operation of the station, as manifested by the testimony, indicates Company control and an employer-employee relationship.

It seems to us entirely clear that it was the intent of the lease and consignment agreement to establish a relationship other than employer-employee in this case and that those agreements were in effect at the time of claimant's injury. The automatically renewable lease and consignment agreement in effect when claimant was injured were not terminable at the Company's will except at the end of each one year term when either party could terminate it by a 30-day written notice. Other provisions for termination became operative only upon a default in a particular obligation under the lease or consignment agreement. In this crucial respect this case differs from those cited by claimant where the station operator has been held to be an employee. Claimant was not on the Company payroll, no Social Security or income tax was withheld on his account, he had described himself as self-employed in filing his income tax returns, the station operating expenses, with the exception of water and electric service charges and real estate taxes, but including workmen's compensation insurance, unemployment insurance and Social Security taxes, were claimant's responsibility; and he withheld income tax from the salaries paid the station personnel. He was obliged to furnish all equipment not included in the lease, and bore any losses from robberies or holdups. The Company's right to alter the premises was subject to the consent of claimant, upon whom the responsibility rested to keep the station in good repair. The lease and consignment agreement confer upon him sole authority to employ or discharge such attendants as he deemed necessary and gave him sole control of them. While claimant testified the Company representative requested him to discharge two members of the "midnite crew" and he did so, it was not established that he was required to do so or face retribution from the Company.

The territorial manager's testimony was that Company suggestions were not always followed by Carter or other dealers. The inferences to be drawn from the differing testimony were for the Commission to determine. *Morgan Cab Co. v. Industrial Com.* (1975), 60 Ill.2d 92, 97.

It is apparent, of course, that one who desired to continue operating a station such as this would normally be aware of the Company's right to terminate his lease at the end of any year, and that the degree to which he complied with Company policies would quite likely be influenced by that awareness. Certainly he might, as claimant says he did, accept consigned products for sale which he preferred not to have; and it would not be unreasonable to expect him to be receptive to Company suggestions for improving the appearance of the station and its employees or the cleanliness of its restrooms. The policies represented by those suggestions, however, were not designed solely for the Company's benefit. In fact, that which specified the maximum amount of money to be carried by employees in the "midnite crew" was intended to minimize the incentive for robbery, and its principal benefit ran to the operator who would bear the loss. Apparently, those who formulated Company policy believed that more customers would be attracted to stations selling its products if the practices, products and prices at such stations were uniform. We see nothing in the manner in which those policies were implemented in this case which would justify a holding that the Industrial Commission's decision that claimant was not an employee is contrary to the manifest weight of the evidence. Whether the precise relationship between the parties is that of landlord and tenant or whether claimant was an independent contractor is, for the purposes of this case, immaterial; in either event he was not a Company employee.

The judgment of the circuit court of Madison County is affirmed.                    *Judgment affirmed.*