(No. 53095.—

GLOBE CAB COMPANY *et al.*, Appellants, v. THE INDUSTRIAL COMMISSION *et al.* (Orval McCabe, Appellee).

*Opinion filed September 30, 1981.*

Samuel J. Ruffolo, of Chicago, for appellants.

Cohn, Lambert & Ryan, of Chicago (Stanford L. Lambert, of counsel), for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

Orval McCabe (claimant) filed a claim against Red Top Cab Company and Globe Cab Company (respondents) under the Workmen's Compensation Act (Ill. Rev. Stat. 1971, ch. 48, par. 138.1 *et seq.*) to recover for injuries he sustained when an automobile hit the cab he was driving. After a hearing, the arbitrator denied the claim for compensation because the relationship of employee and employer did not exist between claimant and respondents. The Industrial Commission, without hearing additional testimony, found that the relationship of employee and employer did exist and reversed the arbitrator's decision. The circuit court of Cook County confirmed the Commission's decision. Respondents appealed to this court under Supreme Court Rule 302(a)(2) (73 Ill. 2d R. 302(a)(2)).

The only issue before the court is whether the claimant was an employee of Red Top Cab Company (Red Top) or Globe Cab Company (Globe), rather than an independent contractor.

At the hearing before the arbitrator, the claimant testified he was employed as a cab driver by Red Top on December 27, 1972, the date of the accident. Claimant testified that on April 5, 1971, he filled out an application with Red Top and signed a "Cab Leasing Agreement." The lease provided the following pertinent provisions:

"1. The Company agrees to rent to the Lessee a taxicab, if available, to be used only in the taxicab business. Said cab is to be operated for hire in the City of Chicago, Illinois and its surrounding territory.
* * *

3. The Company agrees to provide the taxicab in

acceptable operating condition. Lessee agrees to purchase all of the gasoline necessary for the operation of the taxicab.

4. Lessee agrees to report to the Company any mechanical defects or damage to said taxicab.

5. In the event of damage or destruction of the taxicab and/or its equipment from any cause whatsoever * * *, the said Lessee agrees to pay the Company forthwith the cost of repairing or replacing the damaged taxicab and/or its equipment.

* * *

7. Lessee agrees to furnish the Company a daily report setting forth a true and correct statement of the total of all fares procured by said Lessee during lease period. Lessee shall pay his rental to the Company on a daily basis. The minimum daily rental shall be $5.00.

8. If the leased taxicab is seized by authority of law while under the operation or control of the Lessee, Lessee agrees to pay all charges for releasing the taxicab and all costs attendant thereto.

9. This lease is agreed to be personal in nature and Lessee agrees not to sublease said taxicab to anyone else.

10. Lessee agrees to report all accidents to the Company immediately in writing, giving all information including the names and addresses of all witnesses and agrees to actively cooperate in the investigation and defense of any claims growing out of the same whenever called upon by the Company or its representatives.

* * *

13. The Company shall accept no responsibility for injury to Lessee resulting from the use or operation of said automobile or taxicab or while the same is in the possession, either actual or constructive, of the Lessee."

The lease was also signed by "Chicago Red Top Cab Company, Lessor" through the signature of the overseer. Claimant, furthermore, posted a $100 bond with Red Top.

Claimant testified he had to pay for the cab six days a week even though he actually drove it fewer times. However, if he called the Red Top overseer in advance to tell him he would not use the cab on a certain day, the overseer might give the cab to someone else on that date and not charge the claimant. Claimant, moreover, said because he paid for six days a week, he was entitled to first preference on getting a cab each day.

Claimant also testified he would go to the Red Top station to pick up the cab he would drive. The overseer set the hours for the shifts, and claimant's shift was from 4 p.m. to 4 a.m. Claimant stated that although he was not required to sign in or punch in when he arrived, "they'd just see you." Claimant's cab would be driven by someone else in the previous shift, so claimant would have to wait for that driver to return with the cab and refill it before he could take it out on the streets. If the previous driver was late, he would pay claimant a late fee. A waiting driver usually expected a late fee of $5 because that is the amount he might have earned.

Furthermore, claimant testified he usually drove the same cab every shift. His cab was red and white and had a picture of a red top on it. The company's phone number and the words "Red Top" were printed on the cab. On the dashboard inside the cab, claimant's and Globe's licenses were displayed.

The cabs, claimant continued, were not inspected between shifts. When he left the station, he would look for passengers on the streets and he could drive anywhere in Chicago. Although his cab was equipped with a two-way radio, claimant never used the radio. He would leave it on in case of an emergency at home. He would never take the cab home.

Claimant also stated that drivers were not responsible for repairs. If his cab needed repairs, he would take it to the garage at Red Top. Routine maintenance was also per-

formed by Red Top.

Moreover, claimant testified that when a driver returned his cab to the station he was required to refill it and pay for the gas. Claimant stated that, when he first started working, the overseer told him to buy his gas at Red Top unless he needed it on the street. There were gas pumps located in the same building Red Top occupied, but claimant did not know whether the pumps belonged to Red Top or to a washrack company also in the building. At one point in his testimony, claimant stated he bought oil at Red Top, but later he said he did not recall whether he or Red Top paid for the oil.

Claimant also had to pay the overseer for his lease at the end of each shift. Claimant would earn approximately $50, and after he paid for gasoline, he would pay the overseer $17. Red Top did not withhold social security or Federal withholding tax.

Claimant testified the drivers were required to be courteous. In addition, all passengers' complaints went through the Vehicle Commission, not Red Top.

George Robashko also testified at the hearing before the arbitrator. He had been a driver for Red Top for 15 years prior to claimant's accident. When he first began working, he filled out an application similar to the one claimant filled out. Ten years later he signed a lease similar to the one claimant signed. He also paid a $100 bond.

Robashko testified the overseer at Red Top was responsible for hiring drivers and distributing cabs. The overseer gave the new cabs to the drivers with the fewest accidents. A driver would call the overseer to arrange a day off so he might give the car to another driver and not charge the scheduled driver. He also collected money from the drivers and fired them if they abused their cabs.

He further testified that the drivers had to pay for their cabs six days a week regardless of the number of days they actually drove. There was no minimum number of hours

the drivers had to take the cabs out. He stated that if a driver was late in returning his cab, he had to pay the waiting driver $5, a late fee established by the drivers themselves. The drivers, furthermore, did not have to report their total fares to Red Top. Robashko also said the drivers were required to keep their cabs neat and clean and to be courteous to passengers.

At one point Robashko testified he could drive anywhere, but could not pick up fares in the suburbs. Later he stated if he drove to the suburbs, he would call the operator on the two-way radio for a rate or for directions. He said "first suburbs" are a "straight meter" and "second suburbs" are a "flat rate." There was no liability insurance for the cabs in the suburbs.

Each cab, Robashko continued, was equipped with a two-way radio. He stated that a call "comes out of the radio room up in Evanston." Evanston Red Top is affiliated with respondent. Drivers were not required to take calls on the radio to pick up passengers, but Robashko had taken such calls.

Robashko continued that day drivers had to bring their cabs into the station for mechanical work. Because the Red Top garage closed at 5 p.m., night drivers took their cabs to a certain garage outside of Red Top for repairs. He stated that if the cab broke down on the street, a supervisor "took care of you" by performing any service necessary or by towing the cab and providing the driver with another cab, if one was available, to finish his shift. If another cab was unavailable, the driver would take off the rest of the night. In that event, if he had only driven a few hours, the driver would not be charged at all; however, if he had driven eight hours, for example, he would be charged for eight hours' use.

If the driver was involved in an accident which was not his fault, Red Top would repair the cab. If he had caused an accident, Red Top would send the cab to a body shop for

repairs and require the driver to pay for the damage. Drivers had to submit accident reports to Red Top regardless of fault.

Robashko testified each driver had to leave a full tank of gasoline for the driver on the next shift. There was no rule that drivers had to buy their gasoline at Red Top. The gas station there is not owned by Red Top. Robashko stated he bought his gasoline "at the gas station where [he parks]." He did not have to pay for oil.

Moreover, at the end of his shift, Robashko paid the fee for his cab. He paid his own income tax, and no social security or Federal employment tax was withheld by Red Top.

Sam T. Levine testified he is the secretary-treasurer of two separate entities, Globe and Red Top Cab Association, and an officer of the Evanston Red Top Cab Company, the Lincolnwood Red Top Cab Company, and the Skokie Red Top Cab Company. Levine testified there is not and has never been a "Red Top Cab Company." This, he maintains, is true even though the "Cab Leasing Agreement" states that the "Chicago Red Top Cab Company" is the lessor; a 1970 lawsuit filed in Federal district court named "Chicago Red Top Company" as a party defendant along with the Evanston, Skokie, and Lincolnwood Red Top companies; and Levine himself signed his name as secretary of the "Chicago Red Top Cab Co." on a consent decree in the same 1970 case.

Levine also testified Red Top is a "[c]orporation used for owners of taxicab licenses in Chicago." Red Top has an agreement with the owners of the cabs to lease them to drivers. Apparently, 12 corporations own the cabs. Levine stated that Red Top's functions are to "give the owners a uniform color scheme," to keep "abreast of all new rules that the Commissioner has to offer all the cab drivers," and to "see that the owners have insurance * * *." Red Top owns nothing and employs only a secretary-treasurer, a president, an overseer, two supervisors, and a mechanic. Red Top

controls 34 cabs and operates 26 of them on the street. All of the cabs are red and white and have the words "Red Top Cab Association" printed on them. In addition, the owners pay a certain fee per cab for the cab stands.

Levine, furthermore, testified that prior to working for Red Top a driver must have a State driver's license, a city chauffeur's license, and a $100 bond. A potential driver is told if he causes an accident, he must pay for the damage. If he causes an accident and someone is injured, he is covered by public liability insurance. If the driver has an accident which is not his fault, he does not have to pay for the damage. Red Top would cancel a driver's lease if he had been drinking.

Red Top, he continued, does not make rules for drivers other than what is required by the leases. Drivers in Chicago do not have to drive the cabs on the streets for a minimum number of hours. There is no rule that forbids drivers from using the cabs for personal reasons. Red Top does not charge drivers for returning their cabs late. Drivers do not have to buy gasoline from any particular gas station, and Red Top does not own the gas station in the building. And although the lease provides that the drivers must report the fares collected, drivers in Chicago do not have to do this because it is not required by city ordinance.

Levine further testified that Red Top has no requirement that drivers use the two-way radios in their cars. The owners of the cabs decide whether their cabs will be equipped with two-way radios, and 26 out of 34 cabs have them.

Levine stated that 95% of the customers in Evanston, Skokie and Lincolnwood called the cab companies on the telephone for service. He said very few people would call Red Top in Chicago by telephone because the drivers would not pick them up. The phone number for Red Top in Chicago was nevertheless listed in the phone book. In addition, Levine stated the dispatcher in Evanston would broadcast to the drivers that a passenger at a certain

location wanted a cab. The closest cab to the location that bid for that customer would be assigned to him.

Moreover, Levine testified that if a passenger complained about a driver, Red Top would tell him to inform the Public Vehicle License Commission. Red Top had no involvement with passsengers. He also stated that when Red Top's former public liability insurance carrier became insolvent, Red Top defended the drivers in claims against them.

In addition, Red Top also does not pay any unemployment or withhold for social security or income tax from the drivers.

Levine further testified that Globe is a cab company that owns two cab licenses in Chicago. It has no employees.

This court considered under what circumstances a cab driver is an employee rather than an independent contractor in *Morgan Cab Co. v. Industrial Com.* (1975), 60 Ill. 2d 92, a case similar to the one at bar. The court stated:

> "No one factor may determine what the relationship is between parties in a given case. It may be necessary to consider a number of factors with evidentiary value, such as the right to control the manner in which the work is done, the method of payment, the right to discharge, the skill required in the work to be done, and who provides tools, materials, or equipment. Of these factors the right to control the manner in which the work is done is the most important in determining the relationship. *Greenberg v. Industrial Com.*, 23 Ill. 2d 106; *Henn v. Industrial Com.*, 3 Ill. 2d. 325; see also Weidner [*sic*], The Workmen's Compensation Act, 1967 U. Ill. L.F. 21, 24-25." (60 Ill. 2d 92, 97-98.)

(See *Penny Cab Co. v. Industrial Com.* (1975), 60 Ill. 2d 217, 220; accord, *Luby v. Industrial Com.* (1980), 82 Ill. 2d 353, 358; *Carter v. Industrial Com.* (1976), 63 Ill. 2d 414, 421-22; *M.W.M. Trucking Co. v. Industrial Com.* (1976), 62 Ill. 2d 245, 254.) The court also considered whether claimant was

"in the business of operating a fleet of cabs for public use" or was "in the business of simply leasing vehicles with no interest in their operation as taxis." *Morgan Cab Co. v. Industrial Com.* (1975), 60 Ill. 2d 92, 101.

We find Red Top placed too many restrictions on the activities of claimant in driving the cab to be engaged in anything other than the business of operating a fleet of cabs for public use. Red Top determined the hours for the shifts and controlled which drivers got cabs. Claimant testified he was first instructed to buy gasoline at a gas station in the building Red Top occupied. Red Top required all routine maintenance and repairs, except for some repairs needed at night, to be performed in its own garage. If a cab broke down on the street, a supervisor would make the necessary repairs or tow the cab and provide the driver with another cab if one was available. Red Top required its drivers to be courteous to passengers and to keep their cars neat and clean. In addition, the company leased the cabs to the drivers and provided the oil. Red Top or the owners of the cabs paid for the cab stands. All cabs were red and white and had Red Top's name and phone number printed on them. Red Top, furthermore, had a right to discharge the drivers or cancel their leases.

The court will not set aside a finding of the Commission unless it is contrary to the manifest weight of the evidence (*M.W.M. Trucking Co. v. Industrial Com.* (1976), 62 Ill. 2d 245, 255; *Morgan Cab Co. v. Industrial Com.* (1975), 60 Ill. 2d 92, 97), and we find sufficient evidence presented for the Commission to conclude claimant was an employee.

For these reasons the judgment of the circuit court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE RYAN, concurring:

I concur in the opinion of the court. However, I wish to again suggest that a new approach be adopted for deter-

mining, in cases such as this, whether the claimant is an employee or an independent contractor. In *Kirkwood v. Industrial Com.* (1981), 84 Ill. 2d 14, following Professor Larson's suggestion, we stated that the right to control the work may not be the most relevant factor in determining if a worker is an employee in a worker's compensation case. It may be more important to consider the nature of the claimant's work in relation to the regular business of the employer. (1C A. Larson, Workmen's Compensation §§ 43.42, 43.50, at 8—16 to 8—17 (1980).) I take the liberty of quoting at length, as we did in *Kirkwood,* Professor Larson's explanation of this approach:

"The theory of compensation legislation is that the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product. It follows that any worker whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the presumptive area of intended protection." 1C A. Larson, Workmen's Compensation § 43.51, at 8—17 to 8—18 (1980).

In section 43.52, under the heading of "Relativity as essential part of test," Professor Larson states:

"Note that the factor here stressed is in two parts: the nature of the claimant's work, and its relation to the employer's work. The nature of the claimant's work, in the abstract, is seldom a safe guide in itself, and for this reason it is dangerous to rely on precedents classified solely by the character of the worker's job — for example, to say that window-washers are usually held to be employees while lawyers are usually held to be independent contractors. If I, as a private householder, call upon a window-washing company and engage it to do what amounts to one day's work on my house, I am probably not an employer. But an industrial plant

which at regular intervals keeps this same company busy doing what otherwise would be done through its own employees could be held an employer. Similarly, when I seek the services of a lawyer, on the occasion of one of my rare encounters with the legal process, the lawyer is obviously not my employee. But the same lawyer, engaged continuously by a law firm or insurance company, can be an employee.

This test, then, which for brevity will be called the 'relative nature of the work' test, contains these ingredients: the character of the claimant's work or business — how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on — and its relation to the employer's business, that is, how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job." 1C A. Larson, Workmen's Compensation § 43.52, at 8—19 to 8—20 (1980).

In *Kirkwood* we refused to abandon the right-to-control test in favor of the relative-nature-of-the-work test for the practical reasons therein stated. Also in that case, as in this, the briefs had not urged or considered the advantages and disadvantages of the two approaches. I would welcome an opportunity to consider a case in which the briefs thoroughly analyze the comparative merits of the two approaches.