648 P.2d 1053

**DIAL–A–MESSENGER, INC.,**
**Plaintiff-Appellant,**

v.

**ARIZONA DEPARTMENT OF**
**ECONOMIC SECURITY,**
**Defendant-Appellee.**

**No. 1 CA–UB 153.**

Court of Appeals of Arizona,
Division 1, Department C.

May 18, 1982.

Shimmel, Hill, Bishop & Gruender, P. C. by Lewis P. Ames, Andrew W. Bettwy, David R. Seltzer, Phoenix, for plaintiff-appellant.

Robert K. Corbin, Atty. Gen. by James A. Tucker, Asst. Atty. Gen., Phoenix, for defendant-appellee.

OPINION

FROEB, Judge.

This is an appeal from a decision of the Unemployment Insurance Appeals Board

which determined that the parcel delivery services performed within the State of Arizona by drivers for Dial-A-Messenger, Inc., constitute employment within the contemplation of A.R.S. § 23–615 and are not excluded under the provisions of A.R.S. § 23–613.01. For the reasons stated herein, we reverse the decision of the Appeals Board. Another opinion on the same subject is also filed this date in *M. Z. Moore, d/b/a M. Z. Moore & Associates v. Arizona Department of Economic Security*, 132 Ariz. 360, 645 P.2d 1274 (App.1982).

Dial-A-Messenger's parcel delivery service is performed by drivers who transport parcels for customers after orders are placed with Dial-A-Messenger for pickups and deliveries. Dispatchers employed by Dial-A-Messenger contact the drivers by radio and inform them of pickup addresses, the destinations of the packages and the rates to be charged for the services. The drivers select their routes and are responsible for collecting the charges which are turned in daily to Dial-A-Messenger. The drivers are compensated periodically on a per job commission basis. In addition, the drivers earn waiting time charged to the customers on a basis of $1.25 for each ten minutes the driver has to wait after the first five minutes.

Drivers owning and operating their own vehicles lease their vehicles to Dial-A-Messenger, as required by regulation of the Arizona Corporation Commission, A.C.R.R. R14–5–317(B). This lease provides, among other things, that the lease shall be for a period of not less than thirty days, the lease may be canceled by either party by notice to the other and to the Arizona Corporation Commission, and that the motor vehicle shall be under the complete control of the lessee (Dial-A-Messenger) during the existence of the lease.

A separate agreement for services is entered into between Dial-A-Messenger and each of the drivers. The service agreement provides, among other things: (1) Dial-A-Messenger desires to utilize services of the driver on a nonexclusive basis; (2) Dial-A-Messenger provides a central office for receipt of requests for pickup and delivery service, and will furnish the driver with addresses by two-way radio, telephone, or beeper; (3) Dial-A-Messenger will permit the operation of vehicles by the driver under the name of Dial-A-Messenger, all in accordance with the Arizona Corporation Commission Motor Carrier Rules and Regulations; (4) Dial-A-Messenger will make available mobile radios or pagers which may be rented by the driver; (5) the driver will service Dial-A-Messenger's customers in accordance with all Arizona Corporation Commission Motor Carrier Rules and Regulations; (6) the driver will obtain general liability motor vehicle insurance in an amount not less than required by the Arizona Corporation Commission; (7) the driver will bear all financial responsibility, including maintenance of the driver's own separate payroll compensation records and payment of all federal, state and local taxes; (8) the driver will keep a daily manifest of all pickups and deliveries and accumulate signatures of the customers served; (9) the driver has the right to set his own hours; (10) the driver is to be considered an independent contractor and under no circumstances an employee of Dial-A-Messenger; (11) the driver has the right to engage in other services for noncompeting businesses providing performance to the company is in conformance with company police rules and regulations; and (12) either party may cancel the agreement upon notice.

The Appeals Board determined that the services performed by drivers for Dial-A-Messenger constitute employment within the meaning of A.R.S. § 23–615. "Employment" is defined as "any service of whatever nature performed by an employee . . . ." Thus, the issue underlying the Appeals Board's determination is whether the drivers who perform parcel delivery services for Dial-A-Messenger are "employees" within the Employment Security Act. "Employee" is defined in A.R.S. § 23–613.01:[1]

A. "Employee" means any individual who performs services for an employing

---

1. This section has since been amended by Laws 1981, Ch. 246, § 2.

unit and who is subject to the direction, rule or control of the employing unit as to both the method of performing or executing the services and the result to be effected or accomplished. Absent other evidence indicating the employing unit exercises direction, rule or control over the individual as to both the method of performing or executing the services and the result to be effected or accomplished, the following shall not be considered an employee under this section:

1. An individual who performs services for an employing unit which are not a part or process of the organization, trade or business of the employing unit and who is not treated by the employing unit in a manner generally characteristic of the treatment of employees.

2. An individual deemed subordinate or subject to the direction, rule or control, or the right thereof, of an employing unit solely because of a provision of law regulating the organization, trade or business of the employing unit.

3. An individual who performs services for an employing unit through isolated or occasional transactions, regardless of whether such services are a part or process of the organization, trade or business or the employing unit or who performs casual services for an employing unit.

4. An individual who performs services for an employing unit in a capacity as an independent contractor, business person, agent or consultant, or in a capacity characteristic of an independent profession, trade, skill or occupation.

An understanding of legislative background is helpful in analyzing the present case. Prior to 1947, the statutory definition of "employment" determined coverage of an employee under the employment security law. "Employment" was defined in the Unemployment Compensation Law of 1936 as follows:

"Employment" means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, expressed or implied. . . .

In 1937, this definition was amended to include three statutory conditions, which if met excluded coverage for certain employment services. This came to be known as the "ABC" test.[2] There was no separate statutory definition of "employee" as there is now. In 1947, the "ABC" provision was deleted by the legislature and "employment" was redefined as is now set forth in A.R.S. § 23-615:

"Employment" means any service of whatever nature performed by an employee for the person employing him, . . .

In 1961, the Arizona Supreme Court, in *Beaman v. Superior Products, Inc.*, 89 Ariz. 119, 358 P.2d 997 (1961), found that the "ABC" test had been inserted into the Employment Security Act for the purpose of restricting coverage and that the deletion of the test in 1947 broadened the coverage of the Act. 89 Ariz. at 122, 358 P.2d at 998.

In 1979, the Act was again amended to include § 23-613.01 quoted earlier. We held in *Smith v. Arizona Department of Economic Security*, 128 Ariz. 21, 623 P.2d 810 (App.1980) that the enactment of this provision served to restrict the types of employment relationships covered by the unemployment tax. We stated in *Smith*:

[W]e find that A.R.S. § 23-613.01 represents a substantial departure from prior law. Under prior law, the Arizona Supreme Court has held that the statutory scheme under the Employment Security Act abrogated the common law definition of employee and independent contractor in favor of a more liberal construction so that the purposes of the act would be fully realized. (Citations omitted.) A.R.S. § 23-613.01 defines employee in

**2.** Those conditions were: 1) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; 2) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and 3) such individual is customarily engaged in an independently established trade, occupation, profession, or business.

much the same manner as the Federal Unemployment Tax Act. The Federal Unemployment Tax Act has adopted the common law test applied realistically.[3]

*Id.* at 25, 623 P.2d at 814.

The Department questions our determination in *Smith* that Arizona law now defines "employee" in much the same manner as the Federal Unemployment Tax Act, and that therefore the common law test applies. It notes that the statutory language of FUTA defines "employee" to include "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of employee." 26 U.S.C. § 3306(i) (1976). It points out, however, that the Arizona Employment Security Act contains no language requiring application of common law rules to determine the employer-employee relationship. In fact, notes the Department, prior to the enactment of A.R.S. § 23–613.01, the common law concept of "employment" had been rejected by the Arizona Supreme Court in favor of a broader definition of the term. *See Arizona Department of Economic Security v. King*, 122 Ariz. 158, 160, 593 P.2d 908, 910 (1979); *Beaman v. Superior Products, Inc., supra; McClain v. Church*, 72 Ariz. 354, 357–58, 236 P.2d 44, 46–47 (1951).

■ The Department argues that none of the reasons for a broadened construction of the Arizona Employment Security Act have been changed by the enactment of A.R.S. § 23–613.01. We disagree. After the deletion of the "ABC" test in 1947, the coverage of the Act was at its most inclusive stage. *See Beaman v. Superior Products, Inc., supra.* Prior to 1979, the Act did not contain a definition of "employee." The enactment of A.R.S. § 23–613.01 in 1979 added the provision that an "employee" must be "subject to the direction, rule or control of the employing unit as to both the method of performing or executing the services and

the result to be effected or accomplished." This section, rather than the definition of "employment" in A.R.S. § 23–615, is now the central provision for determining coverage of the Act. If the disputed individual is not an "employee" as defined in A.R.S. § 23–613.01, there is no occasion to consider the definition of "employment" in A.R.S. § 23–615. We reaffirm our determination in *Smith, supra,* that the enactment of A.R.S. § 23–613.01 defining employee served to restrict the types of employment relationships covered by the unemployment tax.

We also reaffirm our holding in *Smith* that A.R.S. § 23–613.01 defines "employee" in much the same manner as the Federal Unemployment Tax Act, which has adopted the common law test applied realistically. The applicable Internal Revenue Regulation, 26 CFR 31–3306(i)–1(b), states that an employer-employee relationship exists

> when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. . . . In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services an an independent contractor is not as to such services an employee. . . .

---

**3.** Applying the common law rules "realistically" was further explained in *Illinois Tri-Seal Products, Inc. v. United States*, 353 F.2d 216, 228 (Ct.Cl.1965):
[T]he end-point determination—whether for whom the services are performed as an "em-

ployer" within the common-law meaning of that term—must be made on the basis of actual reality by looking to the substance of the arrangement and giving weight to all relevant factors.

This definition of an employee and independent contractor is entirely consistent with A.R.S. § 23–613.01.

■ To summarize, under Arizona law in effect at all times relevant to this case, the existence of an employment relationship depends upon control by the employing unit not only as to the result to be effected but also as to the method by which the services are performed. In reaching its decision in this area, the Board has applied certain indicia by which it determined that the services here involved that degree of control sufficient to find that the drivers were employees rather than independent contractors. A.C.R.R. R6–3–1723(C).[4] There is no challenge made to the validity of these indicia. We therefore examine the facts of the present case in light of them to determine if the Board was correct in finding that the drivers were employees. A brief synopsis of each of the indicia of control precedes our discussion:

(A) *Authority over the individual's assistants*: Authority by the employing unit over the individual's assistants indicates control over the individual. Section 9 of the employment agreement between Dial-A-Messenger and the drivers states that the agreement is for personal services and is not assignable or transferable. The agreement is silent, however, with respect to assistants of the drivers. None of the witnesses who testified ever had occasion to hire an assistant since the parcels delivered were small. Neil Pritt, the chief operating officer of Dial-A-Messenger, testified that he did not inquire whether any of the drivers employed helpers, and would not object to their doing so. One of the drivers testified that he took his wife with him occasionally and did not feel the need to so inform the company. Another driver testified that although he did not need an assistant he felt he could hire one if he wanted to and would pay the assistant if he hired one.

(B) *Compliance with instructions*: A requirement that one comply with instructions about when, where and how to work indicates control. Dial-A-Messenger's dispatcher tells the drivers where to pick up the parcels and where to deliver them. The parcel must be picked up within sixty minutes after receiving the assignment. The driver is instructed as to Dial-A-Messenger's charges, which are established by the Arizona Corporation Commission, makes the collection, and places each collection in an envelope marked with the job number, the driver number, date, and amount to be collected. The envelopes are turned in daily to Dial-A-Messenger. Each driver keeps a daily manifest of all pickups and deliveries as required by the Arizona Corporation Commission. The drivers choose their own hours of work, and are free to refuse to perform a particular delivery. The drivers also select their own routes for delivery. Any specific instructions from the customers are communicated directly to the drivers by the customers themselves. The only instructions received from Dial-A-Messenger regarding the manner in which the services are performed arise from Dial-A-Messenger's duty to make certain that the drivers are familiar with the Motor Carrier Safety Regulations of the Federal Highway Administration and that their activities will not constitute violations of those regulations. This duty arises by virtue of A.C.R.R. R14–5–317(B)(4).

(C) *Oral or written reports*: Written reports to the employing unit regarding the method by which services are performed indicate control in that the worker must account for his actions. The drivers of Dial-A-Messenger submit manifests which are invoices displaying the job identification number, the driver's identification number, the dates and amounts of charges. These records provide the basis for paying the drivers and are required by regulation. There is no evidence in the record that the drivers are required to submit any reports regarding the manner or method by which their services are rendered.

---

**4.** The full text of A.C.R.R. R6–3–1723(C) setting forth factors adopted by the Department of Economic Security is reproduced in *Smith v.*

*Arizona Department of Economic Security*, 128 Ariz. at 25–27, 623 P.2d at 814–16.

(D) *Personal performance*: Services which must be rendered personally indicate the employing unit is interested in the method as well as the result. The agreement between Dial-A-Messenger and the drivers states that the agreement is for personal services and is not assignable or transferable. Thus, it would appear that the drivers are precluded from hiring a substitute to make the delivery.

(E) *Establishment of work sequence*: A requirement that services be performed in the order or sequence set for him by the employing unit indicates that the worker is subject to control in that he is not free to follow his own pattern of work. The drivers for Dial-A-Messenger are directed as to where and when to make deliveries by the dispatcher who has the authority to set priority on deliveries. This element of control is attenuated by the fact that the drivers have the right to refuse to make a particular delivery.

(F) *Right to discharge*: The right to discharge as distinguished from the right to terminate a contract is an important factor indicating that the person possessing the right has control. With respect to termination, the agreement between Dial-A-Messenger and the drivers provides:

5. The Company and Contractor shall have the mutual right to cancel this agreement if performance is deemed inadequate by either party.

6. The term of this Agreement is from month to month, and either party shall notify the other party verbally or in writing of their desire and intention to terminate the agreement. Upon notification, the agreement shall be cancelled immediately.

The agreement does not provide that the driver may be terminated without notice, without cause, for failure to use specified methods, or for failure to make services available to the public on a continuing basis, any of which would indicate the right of control according to the regulation. R6–3–1723(C)(2)(g). Instead, the agreement provides for termination upon notice and is therefore not indicative of the existence of the right to control. The record indicates that the dispatcher and Neil Pritt have the right to discharge drivers. Pritt testified that he discharged one driver for drinking on the job and another for verbal abuse toward another employee. Such evidence indicates that the drivers may be discharged with cause, but there is no evidence that drivers are discharged without cause.

(G) *Set hours of work*: The drivers of Dial-A-Messenger are free to choose their own hours of work, which indicates lack of control by the employing unit. The testimony indicates that most of the drivers work full eight-hour days, five days a week. Some drivers work part time, and one worked only on Mondays.

(H) *Training*: The drivers are trained only to fill out the manifest and other paperwork, and to use the mobile radio. Such minimal training is not indicative of control by the employing unit.

(I) *Amount of time*: The devotion of a worker full time to the activity of the employing unit indicates control by the employing unit. While most of the drivers work full time for Dial-A-Messenger, this appears to be more a result of individual preference than a requirement imposed by Dial-A-Messenger. The employment agreement specifically states that Dial-A-Messenger desires the services of the drivers on a nonexclusive basis.

(J) *Expense reimbursement*: A lack of control is indicated where the worker is paid on a job basis and must pay his own incidental expenses. The drivers for Dial-A-Messenger pay all their own expenses, including insurance, car maintenance, fuel, oil, commercial license plates, and ACC stamps. Four of the drivers use company-owned vehicles. These drivers receive a smaller percentage of the charges as their commission, thereby in effect shifting the operating costs to the drivers. They still pay for their own gasoline.

In addition to the indicia of control previously set forth, A.C.R.R. R6–3–1723(D) suggests certain factors which indicate an independent status:

(1) *Availability to the public*: The fact that an individual makes his services available to the general public on a continuing basis is usually indicative of independent status. In this case, the driver's availability to the general public was limited by A.R.S. § 40–607(C), which would prevent the issuance of a certificate of convenience and necessity to operate a common motor carrier over a route or in a territory already served by common carrier except "when the existing common motor carrier operating over the route or serving the territory, will not provide service of a character and over an area deemed satisfactory by the commission." Thus, since Dial-A-Messenger was authorized to provide a parcel delivery service in the Phoenix area, the individual drivers did not possess the requisite certificate of convenience and necessity from the Commission in order to make their services available to the public.[5] *See Corporation Commission v. Pacific Greyhound Lines*, 54 Ariz. 159, 94 P.2d 443 (1939).

(2) *Compensation on job basis*: The drivers are paid at the end of each week on a per job commission basis, which is indicative of an independent contractor status.

(3) *Realization of profit or loss*: The income of the drivers depends upon the relationship of their expenses to their earned commissions. Thus, they are in a position to realize profit or suffer loss, which indicates an independent contractor status.

(4) *Significant investment*: Most of the drivers supply their own vehicles for their delivery service. Although the radio and paging devices are supplied by Dial-A-Messenger, the drivers must pay a deposit for their use. Such investment indicates an independent status.

It appears from the foregoing that Dial-A-Messenger exerts control over the drivers in very limited respects. The drivers are required to keep a daily manifest of pickups and deliveries, and they are required to be familiar with the Motor Carrier Safety Regulations of the Federal Highway Administration. The vehicles owned by the drivers must be leased to the company, and identify the company as the operating carrier. Furthermore, the drivers must obtain general liability motor vehicle insurance in an amount not less than that required by the Arizona Corporation Commission. All these elements of control are required by law, however, and should therefore be excluded from the balancing procedure in determining the status of the drivers. A.R.S. § 23–613.01(A)(2).[6] Other elements of control present in this case include directions given by the dispatcher as to where and when to make deliveries (attenuated by the driver's ability to refuse to make the delivery) and the requirement for the personal services of the driver.

After considering all factors involved, we conclude that the evidence is insufficient to establish the degree of control over the manner in which the drivers perform their services necessary to establish an employer-employee relationship. Therefore, Dial-A-Messenger is not required to pay unemployment taxes on the drivers' earnings.

For the reasons set forth, the decision of the Unemployment Insurance Appeals Board is reversed.

EUBANK, P. J., and HAIRE, J., concur.

---

**5.** This restriction has presumably been eliminated by deregulation of Arizona common motor carriers. *See* Laws 1981, Ch. 207, effective July 1, 1982.

**6.** A.R.S. § 23–613.01(A) provides:
[E]mployee does not include:

2. An individual subject to the direction, rule, control or subject to the right of direction, rule or control of an employing unit solely because of a provision of law regulating the organization, trade or business of the employing unit.