781 P.2d 1374

**CENTRAL MANAGEMENT COMPANY,**
Petitioner Employer,

Travelers Insurance Company,

v.

The **INDUSTRIAL COMMISSION OF
ARIZONA,** Respondent,

Dolores Leonard, Respondent
Employee,

Florenda Smith, Respondent Employer,

No Insurance Section,
Respondent Carrier.

No. 1 CA–IC 88–153.

Court of Appeals of Arizona,
Division 1, Department D.

Oct. 24, 1989.

JoAnn C. Gaffaney, Phoenix, for petitioner Employer and petitioner Carrier.

Catherine A. Fuller, Chief Counsel by Laura L. McGrory, Asst. Chief Counsel, The Indus. Com'n of Arizona, Phoenix, for respondent and respondent Carrier.

Jerome, Gibson & Stewart, P.C. by James L. Stevenson, Phoenix, for respondent Employee.

GRANT, Chief Judge.

This is a special action review of an Industrial Commission award for a compensable claim. We must decide whether the administrative law judge erred by finding that the respondent employee (claimant) was an employee of the petitioner employer, Central Management Company (CMC) and not of respondent employer, Florenda Smith (Smith). CMC seeks review, asserting that Smith was either the sole or dual employer of the claimant. Because we find the administrative law judge's award reasonably supported by the evidence, we affirm.

The claimant was injured on September 6, 1987, while standing outside of a taxi cab. The claimant filed a workers' compensation claim listing both Smith and CMC as employers. The claim was denied for benefits by both the insurance carrier for CMC and the No Insurance Section for Smith. The claimant timely requested a hearing. The claimant and CMC's General Manager testified at the only hearing.

Lamonte H. Jackson, CMC's General Manager, testified regarding the company's operations. He explained that CMC is the owner and parent company of Courier Cab, Shamrock Taxi, Discount Taxi, and Carefree Courier. CMC runs a dispatch operation for the cabs and owns the radio system in each cab. CMC has two different types of drivers: owner/operators and lease-to-purchase drivers. An owner/operator owns his own vehicle and contracts with CMC to provide cab services. A lease-to-purchase driver enters into a written agreement with CMC to lease a cab, makes payments toward its purchase price, and enters into a vehicle maintenance agreement intended to keep the vehicle in a safe condition.

Before being allowed to drive for CMC, a prospective driver fills out a CMC employment application, provides a motor vehicle department report, and pays various fees based on the cab division for which he is going to drive. All drivers must have a Chauffeur's License. CMC also employs a full-time trainer and requires all prospective drivers to successfully complete a one-day training program. The trainer uses CMC's policies and procedures manual, which addresses a variety of topics including safety, dispatching, cordiality with customers, cab stand locations, and breakdowns. The training program includes classroom time followed by a written test and a road test, although this claimant did not take a road test. Applicants are graded on a point system. An applicant who fails is required to repeat the program.

Once employed, a driver is allowed to pick up fares anywhere in the city with the exception of the Princess Resort and Gainey Ranch. Drivers are dispatched from cab stands established by CMC throughout the city. CMC can "redline", i.e., withhold radio calls, from drivers who refuse calls without good reason, are guilty of reckless driving, or use profanity on the radio. Drivers repeatedly redlined are subject to disciplinary action and termination by CMC. Drivers are also required by CMC to be neatly groomed, although no specific uniform is required.

Lease-to-purchase drivers are allowed to use their cabs for personal matters. They are also allowed to sublease their cabs to other CMC-approved drivers, but these drivers are subject to the same hiring procedures CMC employs for its lease-to-purchase drivers. Drivers are also allowed to solicit their own business by using the mobile phones in their cabs and are allowed to set their own hours and vacations. The company provides no fringe benefits and has never asked drivers for proof of workers' compensation insurance.

CMC has a sales department which solicits business from hotels and other private companies. It enters into agreements to provide cab service on a voucher system. Drivers pick up fares which are paid for by voucher and then turn in the vouchers to CMC for credit on their lease payment. CMC also has a garage facility which provides maintenance on its lease-to-purchase cabs. In addition, if an accident occurs, CMC sends out an independent investigator and a road supervisor. The cabs are clearly marked as "Courier" cabs, as are customer receipts.

The claimant testified that she became employed by CMC in March, 1987. She filled out an employment application, provided a motor vehicle department report, and successfully completed the one-day training program. She was hired by CMC's General Manager Jackson and began driving for lease-to-purchase driver Duke McFarland. After several months, CMC negotiated and approved her transfer to Smith, another lease-to-purchase driver.

The claimant testified that she paid Smith $52 a day for the use of the cab and drove the cab at night, approximately twelve hours per shift. The claimant kept everything she made over and above the $52 payment and was responsible for paying her own taxes. The claimant gave Smith any vouchers that she received as part of the $52 payment. After her shift, she returned the cab clean and full of gas to Smith's home. Smith drove the cab during the day.

When the claimant began driving for Smith, she received an additional four hours of training. Smith also held driver meetings once a month, at which she circulated policy changes and memoranda from CMC. She required all drivers to initial a copy of memoranda from CMC to prove that they had received them. Smith did not allow eating, drinking or smoking in her cab, and had fired a driver who had dented one of her cabs. The claimant testified that she was not allowed to hire anyone to drive for her, and she was not allowed to drive for any other company while employed by CMC.

The claimant testified that she and Smith followed CMC's written dress code and wore black and white. If she had any difficulties with the cab, she notified both CMC's dispatcher and Smith. CMC provided routine maintenance on the cab, which Smith obtained during the day shift. CMC carried liability insurance on the cabs but did not carry medical insurance on the drivers. CMC set the maximum cab fares which a driver could charge. Finally, the claimant testified that after the accident, she was released to drive by CMC's General Manager.

On August 25, 1988, the administrative law judge entered an award for a compensable claim. She found that the claimant was an employee of CMC. On administrative review, the administrative law judge supplemented and affirmed the award, adding that the claimant was not an employee of Smith and that "CMC had substantial authority and right to control both applicant and defendant Smith." CMC brought this special action.

### STANDARD OF REVIEW

 Before proceeding to a substantive review of the issues, we reaffirm the standard of review in this case as enunciated in *Hunt Bldg. Corp. v. Industrial Comm'n*, 148 Ariz. 102, 713 P.2d 303 (1986):

> This court and the court of appeals must consider all evidence in the light most favorable to sustaining the Commission's award.... We have stated that '[a]wards of the Industrial Commission will be sustained if they are reasonably supported by the evidence and appellate courts will not weight [sic] evidence but consider it in a light most favorable to sustaining the awards.'

*Id.* at 106, 713 P.2d at 307 (citations omitted). However, we also recognize that an appellate court may make an independent determination of whether a claimant is an independent contractor as a conclusion of law based on the totality of facts and circumstances. *Anton v. Industrial Comm'n*, 141 Ariz. 566, 688 P.2d 192 (App. 1984).

### DEFINITION OF AN EMPLOYEE

The distinction between an employee and an independent contractor usually rests on the extent of control the employer may exercise over the details of the work. As Professor Larson explains:

> The traditional test of the employer-employee relation is the right of the employer to control the details of the work. It is the ultimate right of control, under the agreement with the employee, not the overt exercise of that right, which is decisive. If the right of control of de-

tails goes no further than is necessary to ensure a satisfactory end result, it does not establish employment.

1C A. Larson, *Workmen's Compensation Law* § 44.10 at 8–40 (1986).

■ The Arizona Workers' Compensation statute tracks this traditional test. It provides in relevant part:

B. When an employer procures work to be done for him by a contractor over whose work he retains supervision or control, and such work is a part or process in the trade or business of the employer, then such contractors and the persons employed by him and his subcontractor and persons employed by the subcontractor, are, within the meaning of this section, employees of the original employer.

C. A person engaged in work for another, and who while so engaged is independent of the employer in the execution of the work and not subject to the rule or control of the person for whom the work is done, but is engaged only in the performance of a definite job or piece of work, and is subordinate to the employer only in effecting a result in accordance with the employer's design, is an independent contractor, and an employer within the meaning of this section.

A.R.S. § 23–902. Thus, under this definition, a worker who is regularly employed in the business of an employer is an "employee" for the purposes of workers' compensation unless the worker is not subject to the employer's control, is hired only to perform a definite job, and is subordinate solely in effecting a desired result. Because of the remedial purposes of the Act, the definition of employee should be liberally construed. *Hughes v. Industrial Comm'n*, 113 Ariz. 517, 558 P.2d 11 (1976); *Flamingo Motor Inn v. Industrial Comm'n*, 133 Ariz. 200, 650 P.2d 502 (App.1982).

In deciding whether this particular claimant fits within the statutory definition of an employee, we look to the totality of the circumstances of her work for CMC and examine the various indicia of control. *See Reed v. Industrial Comm'n*, 23 Ariz.App. 591, 534 P.2d 1090 (1975). Earlier Arizona

decisions have considered such indicia of control as the duration of the employment, the method of payment, who furnishes the necessary equipment, the right to hire and fire, who bears responsibility for worker's compensation insurance, the extent to which an employer may exercise control over the details of the work, and whether the work was performed in the usual and regular course of the employer's business. *Home Ins. Co. v. Industrial Comm'n*, 123 Ariz. 348, 350, 599 P.2d 801, 803 (1979). No one of these indicia of control, in itself, is conclusive. *Id.*

## CONTROL TEST AS APPLIED TO CMC

■ We first review the evidence supporting the administrative law judge's finding that CMC was the claimant's employer. The facts reveal that the claimant had significant interaction with CMC before and during her employment. She was initially hired by CMC through its general manager after completing a CMC application, providing a satisfactory motor vehicle department report, and successfully completing CMC's training program. She had contact with CMC via the dispatcher throughout her shift. While the claimant was paid solely by the fares she picked up, at least some of these fares were paid with CMC-issued vouchers. In addition, CMC owned and maintained the cab which the claimant drove. Indeed, since CMC was in the business of providing cab service, the actual place of business was arguably the cabs themselves. *See Employment Sec. Comm'n v. Laramie Cabs*, 700 P.2d 399, 407 (Wyo.1985). As to the duration of the employment, the claimant's position with CMC was permanent as long as she did not accrue more than two moving violations or repeatedly violate CMC's rules; she was not "engaged only in the performance of a definite job or piece of work," as the statute requires for exclusion from the employee definition.

Significantly, operating taxi cabs was the usual and regular course of CMC's business. CMC owned four different taxi cab companies and dispatch operations, as well as the radio equipment in each cab. Its

business was conducted mostly through these dispatch operations. CMC was not simply leasing vehicles which coincidentally were used as taxi cabs. It was in the business of operating, maintaining, controlling, and presenting to the public a fleet of cabs for public transportation. The claimant's work was not only an integral part of that business—it was the essential core of CMC's business.

We addressed the "regular course of business" factor in *Anton v. Industrial Comm'n*, 141 Ariz. 566, 688 P.2d 192 (App. 1984). In that case, a contractor, Perkins, entered into an agreement to harvest certain trees and deliver the lumber to Southwest Forest Industries, a lumber company. Southwest gave Perkins detailed specifications for the wood, which Perkins passed on verbatim to his woodcutters. Perkins hired Anton as one of these woodcutters under a written contract. That contract required Anton to fell trees, cut them into logs, stack the logs into cords, and clean up the forest, all in accordance with the Southwest specifications. Perkins reserved to himself only the task of picking up and delivering the wood to Southwest. During the process, Perkins checked Anton's work, insuring that he cut the logs correctly, selected the right quality of wood, stacked the timber as directed, cleaned the forest sufficiently, and worked quickly. Anton was later injured on the job and filed for workers' compensation. The administrative law judge denied compensation finding that Anton was an independent contractor. On review, this court set aside the award. We held that Anton was an employee for purposes of workers' compensation, because Perkins had not limited his attempt to contract to a particularly "well-defined incidental activity ... ancillary to the central concerns of his business" but had hired Anton to perform the "ongoing basic employment activity" itself. *Id.* at 573, 688 P.2d at 199. Like the woodcutter, the claimant's cab driving services were an integral part of CMC's regular business of providing cab service.

Finally, with regard to exercising control over the details of the work, we note that CMC set the maximum cab fares to be charged, dictated where cabs could pick up fares, maintained a dress code for employees, and could refuse to dispatch calls to drivers that failed to follow its policies. If the claimant refused to take calls relayed by the dispatcher, she could be redlined or even fired.

Taking these facts as a whole, we find sufficient evidence to affirm the award. We are not persuaded by CMC's argument that because of the unique characteristics of the taxi cab industry, we should decide this case as some other jurisdictions have and find the claimant an independent contractor. *See, e.g., Alford v. Victory Cab Co.*, 30 N.C.App. 657, 228 S.E.2d 43 (1976); *LaGrande v. B & L Serv., Inc.*, 432 So.2d 1364 (Fla.App.1983); *Coviello v. Industrial Comm'n*, 129 Ohio St. 589, 196 N.E. 661 (1935); *Industrial Comm'n v. Warren Zone Cab Co.*, 191 N.E.2d 852 (Ohio Ct. Com. Pleas 1963). In fact, many jurisdictions hold that taxi drivers are employees for workers' compensation purposes. *See* Larson, § 44.34(d) n. 94.2; *Alford*, 30 N.C. App. at 660, 228 S.E.2d at 46; *see also Morgan Cab Co. v. Industrial Comm'n*, 60 Ill.2d 92, 324 N.E.2d 425 (1975) and cases cited therein; *Ziegler v. Fillmore Car Service*, 83 A.D.2d 692, 442 N.Y.S.2d 276 (1981). Given the facts of this case, we join those jurisdictions and hold the claimant was CMC's employee.

We are cognizant of this court's earlier opinions, *Fullerton v. Arizona Department of Economic Security*, 135 Ariz. 360, 661 P.2d 210 (App.1983), and *Dial-a-Messenger v. Arizona Department of Economic Sec.*, 133 Ariz. 47, 648 P.2d 1053 (App.1982), holding that certain workers for delivery services are independent contractors and not employees under Arizona's unemployment compensation statutes, A.R.S. § 23–613.01 *et seq.* A close factual comparison of these cases with the one at bench reveals that CMC exercised greater control in several areas under consideration in those cases, by providing training, evaluating performance and refusing dispatch service for deficient performance, retaining control over those hired by persons already working for CMC, providing maintenance

on the leased vehicles, and designating cab stands and restricted areas. We find that these additional indicia of control justify the disparate results reached. *See Employment Security Comm'n of Wyoming v. Laramie Cabs, Inc.*, 700 P.2d 399 (Wyo. 1985) (split court found that cab drivers are employees for purposes of unemployment compensation).

Moreover, we focus our analysis in this case, as the court in those cases did not, on the *Anton* factor that CMC conducted the essential core of its business through drivers such as claimant.

### CONTROL TEST AS APPLIED TO SMITH

 CMC also appeals the administrative law judge's finding on administrative review that Smith was merely a conduit through which CMC conducted its business and not a dual employer who must share responsibility for Smith's compensation. *See, e.g., Home Ins.*, 123 Ariz. at 349, 599 P.2d at 802 (hearing officer held dual employers each responsible for one-half of benefits due claimant); *Butler v. Industrial Comm'n*, 50 Ariz. 516, 73 P.2d 703 (1937) (dual employers must pay compensation in proportion to wages paid by each to claimant).

It is true that Smith agreed to sub-lease her vehicle to the claimant, but only after the claimant met CMC's qualifications and was hired by CMC. It is also true that Smith exercised some control over the details of claimant's work by adding conditions of her own. However, these mainly concerned care of the vehicle rather than claimant's performance of the essential work of transporting fares. Even so, the equipment was leased from CMC, and thus CMC also had an interest in the care of the vehicle. It does not appear that Smith could instruct the claimant to disregard CMC's policies on day-to-day operations. In fact, she circulated CMC's memoranda and insisted they be read and followed by the claimant. *See Alexander v. Alexander*, 51 Ariz. 269, 76 P.2d 223 (1938) (person used by an employee to do work of employer is also employee of employer). Given

these facts, the administrative law judge had sufficient evidence to rule that Smith functioned as a conduit through which CMC's policies and practices were distributed and enforced.

### CONCLUSION

After reviewing the various indicia of control with regard to both CMC and Smith, we hold that the evidence permitted the administrative law judge to conclude that the claimant was an employee of CMC and not of Smith. The administrative law judge's award is affirmed.

GERBER, P.J., and FIDEL, J., concur.