[No. A046628. First Dist., Div. One. Jan. 16, 1991.]

YELLOW CAB COOPERATIVE, INC., et al., Petitioners, v. WORKERS' COMPENSATION APPEALS BOARD and RICHARD EDWINSON, Respondents.

**COUNSEL**

Joseph D'Andre and Jeffrey E. D'Andre for Petitioners.

William B. Donohoe, Needham, Hull & Dykman and Craig Dykman for Respondents.

---

**OPINION**

**RACANELLI, P. J.**—Petitioners Yellow Cab Cooperative, Inc. (Yellow) and Golden Eagle Insurance Co. challenge a decision by the Workers' Compensation Appeals Board (Board) holding that Yellow was the employer, for workers' compensation purposes, of applicant Richard Edwinson, a cabdriver. We have concluded that the Board did not err.

## I. BACKGROUND

Prior to 1976, the drivers of Yellow cabs were unionized employees. In 1976 the company went into bankruptcy. In 1979 it adopted a system under which drivers leased cabs and were no longer deemed employees of the company.

Applicant first drove a Yellow cab for about seven years starting in the mid-1960's. When the company went into bankruptcy, he quit and tried various other endeavors. In 1986, he went to Yellow's front office and applied for work as a driver. He attended a meeting between prospective drivers and a representative of Yellow. The drivers were tested on their familiarity with the city, and the Yellow spokesman "explained some of what the job required of us."

During or after this meeting applicant executed a written "Taxicab Lease Agreement" designating him as "Lessee" and Yellow Leasing Co., a division of Yellow Cab Cooperative, Inc., as "Lessor" or "Leasing Company." The lease provided in part that applicant would lease a cab for 10-hour shifts; that he would pay $56 per shift; that the lease would be automatically renewed at the end of each week; that it could be terminated by either party on prior notice; that it could be cancelled for breach without notice; that applicant was not required to render any service to Yellow; that no employment relationship existed between them; that the relationship was strictly one of lessor and lessee; that applicant was a self-employed person "free from authority and control of LEASING COMPANY"; that applicant was not eligible for workers' compensation insurance and Yellow was not obliged to provide it; that "once LESSEE takes possession of the taxicab, he or she will exercise complete discretion in its operation"; that he would not share his fares with Yellow or account to it for them; that he was not restricted in any

way in the area where he could operate and was not required to use any stand, answer radio calls, or report his location; that he would display a sign in or on the cab identifying him as a self-employed lessee; that Yellow Cab would provide telephone call service, radio service, and repair and maintenance service; that it would furnish all necessary supplies except that applicant had to purchase his own gasoline; and that it would furnish liability insurance and would pay for all licenses, taxes, and fees on the cab.

Applicant testified that he signed the lease without negotiation because he was in a financial bind and needed work. He saw that there would be no workers' compensation; it was too expensive for him to get; it was not important to him then. He could have sought employment elsewhere, but he had worked for Yellow before; if he wanted to work for them he had to sign. After he started work under the lease, there was hardly any difference from when he had worked for Yellow before. The only differences were that in the old days he received fringe benefits, he was on commission with a guaranteed wage from which taxes were withheld, and he could not go to the airport.

Applicant was injured on March 3, 1988, when he was pinned between two cabs at a taxi stand. He filed a claim for workers' compensation, naming Yellow as his employer. Yellow denied that it was applicant's employer, alleging that he was a "lessee/independent contractor." After an evidentiary hearing, the workers' compensation judge (WCJ) ruled that Yellow was applicant's employer for workers' compensation purposes. The Board denied reconsideration. ██ Yellow and its compensation insurer brought this proceeding for a writ of review.[1]

## II. RENDITION OF SERVICE

By statute, any person rendering "service" to another is presumed to be an employee except as excluded from that status by law. (Lab. Code,

---

[1] Shortly before oral argument petitioners filed a request to "abandon" their "appeal." It stated that applicant had entered into a settlement of a third-party action, the proceeds of which are a credit against workers' compensation benefits, and that the settlement was large enough to eclipse any award which might be entered against petitioners. Applicant opposed dismissal.

We denied the request. Petitioners have no absolute right to abandon an appellate proceeding after the record has been filed and the matter has been fully briefed. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 505, 506, pp. 491-493.) We doubt that the matter is technically moot; the question of Yellow's liability remains justiciable even if, as Yellow asserts, there is little practical likelihood that it will actually pay benefits. (See *id.*, § 519, p. 502.) Further, this case involves issues of continuing public interest which are likely to recur; therefore we have discretion to decide it on the merits even if it is otherwise subject to dismissal. (*Okuda* v. *Superior Court* (1983) 144 Cal.App.3d 135, 137, fn. 1 [192 Cal.Rptr. 388]; see 9 Witkin, *op. cit. supra*, §§ 506, 526, pp. 491-493, 509-513.) We have concluded that such a decision is necessary here to provide guidance and avoid unwarranted delay in the payment of compensation in other cases presenting the same issues.

§ 3357.)[2] Where an injured worker was "performing service" for a putative employer, the latter has the burden of affirmatively proving that the worker was not an employee.[3] (§ 5705.) In ruling that applicant was Yellow's employee, the WCJ cited both of these sections. Petitioners assert that this was error because applicant was not rendering or performing "service" for Yellow when he was injured.

In *Laeng* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 771, 783 [100 Cal.Rptr. 377, 494 P.2d 1], the court held that a job applicant injured during a tryout was "in the service of the employer" for compensation purposes because his conduct was undertaken for the employer's benefit and was under the employer's direction and control. ■■■ It appears that both these elements—"control" and "benefit"—were amply demonstrated here. The question of control is discussed in detail below. (See *post*, pt. V.) We here address the question whether applicant's efforts as a cab driver were undertaken for Yellow's benefit.

Contrary to Yellow's portrayal here, the essence of its enterprise was not merely leasing vehicles. It did not simply collect rent, but cultivated the passenger market by soliciting riders, processing requests for service through a dispatching system, distinctively painting and marking the cabs, and concerning itself with various matters unrelated to the lessor-lessee relationship. Applicant testified that he and other drivers were instructed in "service" and "courtesy," i.e., "being properly presented in our dress, keeping the cabs clean, going on calls that we were sent on and being courteous and helpful to the public." Written radio regulations provided, among other things, "Never just sit there waiting and/or blasting your horn unless you have been told to do so by the dispatcher. [¶] In case of disputes with other drivers about who should get the call, never argue about it in front of customers."

We follow courts elsewhere in holding that Yellow's enterprise consists of operating a fleet of cabs for public carriage. (See *Central Management* v. *Industrial Com'n* (1989) 162 Ariz. 187 [781 P.2d 1374, 1377-1378]; *Globe Cab Co.* v. *Industrial Commission* (1981) 86 Ill.2d 354 [55 Ill.Dec. 928, 427

---

[2] Labor Code section 3357 provides: "Any person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee."

All further statutory references are to the Labor Code.

[3] Section 5705 provides in part: "The following are affirmative defenses, and the burden of proof rests upon the employer to establish them: (a) That an injured person claiming to be an employee was an independent contractor or otherwise excluded from the protection of this division where there is proof that the injured person was at the time of his injury actually performing service for the alleged employer."

N.E.2d 48, 52]; *Hannigan* v. *Goldfarb* (1958) 53 N.J.Super. 190 [147 A.2d 56, 62].) The drivers, as active instruments of that enterprise, provide an indispensable "service" to Yellow; the enterprise could no more survive without them than it could without working cabs. Thus the factual predicate was laid for application of sections 3357 and 5705, subdivision (a).

### III. Presumption of Employment

■ Petitioners object to the WCJ's reliance on section 3357 on the further ground that the statutory presumption of employment is inapplicable by its terms when the putative employer asserts that the worker was an independent contractor. For this proposition they cite *Mission Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 211 [176 Cal.Rptr. 439], where the court said that the statute "does not apply to a person rendering service for another as an independent contractor" and "[w]hether the applicant . . . was an independent contractor or an employee is the very issue to be decided." (123 Cal.App.3d at p. 226.)

Concededly, the statute is somewhat tautological. However, we know of no other authority which holds it entirely inapplicable where the injured worker is contended to be an independent contractor. Several cases have cited the statute in such a context. (E.g., *S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*); *Germann* v. *Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 776, 783 [176 Cal.Rptr. 868]; *Johnson* v. *Workmen's Comp. Appeals Bd.* (1974) 41 Cal.App.3d 318, 321 [115 Cal.Rptr. 871].) It is best understood as creating a presumption that a service provider is presumed to be an employee unless the principal affirmatively proves otherwise.

Indeed the supposed inapplicability of section 3357 is of little significance given the meaning generally attributed to section 5705, subdivision (a), *ante*, footnote 3. The Supreme Court recently described that section as creating "a general presumption that any person 'in service to another' is a covered 'employee.'" (*Borello, supra*, 48 Cal.3d at p. 354.) In the same opinion it cited section 3357 in connection with the burden of proof. (*Id.* at p. 349.) Whether these statutes are described in terms of a presumption, an affirmative defense, or an allocation of the burden of proof, the effect is the same: the employer must show that the applicant is not entitled to the benefits of the act. (See § 3202; *Laeng* v. *Workmen's Comp. Appeals Bd.*, *supra*, 6 Cal.3d 771, 777.) Therefore if the WCJ erred in citing section 3357, the error was harmless.

### IV. Effect of Common Law Authorities

■ The traditional definition of "employment" evolved at common law to delineate the hirer's vicarious liability for the tortious acts of the

person hired. (*Borello, supra*, 48 Cal.3d at p. 350.) Although a number of "secondary" indicia were considered, the primary factor in drawing the distinction was the degree of "supervisory power" possessed by the principal. (*Ibid.*) Traditionally, employment was found only if the principal possessed "the right to direct the details of the work" (*McFarland* v. *Voorheis-Trindle Co.* (1959) 52 Cal.2d 698, 704 [343 P.2d 923]) or "complete and authoritative control of the mode and manner in which the work is performed" (*Perguica* v. *Ind. Acc. Com.* (1947) 29 Cal.2d 857, 859 [179 P.2d 812]; see *Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43 [168 P.2d 686], overruled on another point in *People* v. *Sims* (1982) 32 Cal.3d 468, 479-480, fn. 8 [186 Cal.Rptr. 77, 651 P.2d 321].)

Early cases applied these same criteria to define "employment" for workers' compensation purposes. (E.g., *Perguica* v. *Ind. Acc. Com., supra*, 29 Cal.2d 857.) More recently, however, the Supreme Court has declared that the scope of compensation coverage "cannot be determined simply from technical contractual or common law conceptions of employment but must instead be resolved by reference to the history and fundamental purposes underlying the Work[ers'] Compensation Act." (*Laeng* v. *Workmen's Comp. Appeals Bd., supra*, 6 Cal.3d at p. 777.)

This principle was reaffirmed in *Borello, supra*, 48 Cal.3d 341, where the court held that a group of migrant "share farmers" were employees for workers' compensation purposes despite an apparent absence of direct supervision and a written agreement purporting to make them independent contractors. The court said that "the concept of 'employment' embodied in the Act is not inherently limited by common law principles." (*Id.* at p. 351, see pp. 352, fn. 6, 353, citing *Truesdale* v. *Workers' Comp. Appeals Bd.* (1987) 190 Cal.App.3d 608, 617 [235 Cal.Rptr. 754]; *Germann* v. *Workers' Comp. Appeals Bd., supra*, 123 Cal.App.3d 776, 784; *Johnson* v. *Workmen's Comp. Appeals Bd., supra*, 41 Cal.App.3d 318, 322-323.) It identified a number of "useful" tests for defining employment in compensation cases, noting that the relevant factors "may often overlap those pertinent under the common law." (48 Cal.3d at p. 354.) Most importantly, it held that the statutory test of "control" may be satisfied even where "complete control" or "control over details" is lacking—at least where the principal retains pervasive control over the operation as a whole, the worker's duties are an integral part of the operation, the nature of the work makes detailed control unnecessary, and adherence to statutory purpose favors a finding of coverage. (*Id.* at pp. 355-358.)

In contending that applicant was not Yellow's employee, petitioners rely almost entirely on cases which explicitly apply common law employment criteria. In *Mission Ins. Co.* v. *Workers' Comp. Appeals Bd., supra*, 123

Cal.App.3d 211, the court applied what Justice Kaufman described as "well established" principles to reverse a finding that a security alarm agent was the alarm company's employee. (123 Cal.App.3d 217, 218-219, 226-227.) These principles included the traditional requirement of " '*complete* control.' " (*Id.* at p. 221, quoting *Western Indemnity Co.* v. *Pillsbury* (1916) 172 Cal. 807, 811 [159 P. 721], italics in *Western*.)[4] Similarly, the court in *Local 777, Democratic U. Organizing Com.* v. *N. L. R. B.* (D.C. Cir. 1978) 603 F.2d 862, 904, held that lessee cabdrivers in Chicago were within "the common law definition of independent contractors" and therefore were not employees covered by the National Labor Relations Act (NLRA).[5]

Petitioners cite four sister-state cases holding that lessee cabdrivers are not employees for workers' compensation purposes.[6] All of those decisions expressly or impliedly rest on common law definitions of employment; for that reason alone they are not persuasive authority under California law. Furthermore they represent a minority view. Courts in 10 other states have held that lessee cabdrivers are or may be employees of the cab company for compensation purposes.[7]

Petitioners' reliance on common law criteria, and cases applying them, is misplaced. The dispositive question is whether the criteria and principles

[4]Later, while sitting on the Supreme Court, Justice Kaufman dissented from *Borello* because he found the majority opinion irreconcilable with "[t]he law . . . [which] has been uniformly followed . . . throughout the years." (48 Cal.3d at p. 368.)

[5]Indeed the court acknowledged cases holding that such cabdrivers are employees under Illinois workers' compensation law. (603 F.2d at pp. 876-877, fn. 38, citing *Morgan Cab Co.* v. *Industrial Commission* (1975) 60 Ill.2d 92 [324 N.E.2d 425], and *Penny Cab Co.* v. *Industrial Commission* (1975) 60 Ill.2d 217 [326 N.E.2d 393].) The court was unpersuaded by those cases, in part because the NLRA required it to adhere to common law conceptions of employment. (*Ibid.*)

[6]*Cole* v. *Peachtree Cab Co.* (1970) 121 Ga.App. 177 [173 S.E.2d 278]; *Industrial Commission* v. *Warren Zone Cab Co.* (Ohio Ct.Com.Pleas 1963) 191 N.E.2d 852; *LaGrande* v. *B & L Services, Inc.* (Fla.Dist.Ct.App. 1983) 432 So.2d 1364; *Alford* v. *Victory Cab Co., Inc.* (1976) 30 N.C.App. 657 [228 S.E.2d 43]. Not cited by petitioners, but to the same effect, is *Safety Cab., Inc.* v. *Indiana Employment Security Bd.* (1968) 143 Ind.App. 572 [242 N.E.2d 25].

[7]*Central Management* v. *Industrial Com'n, supra*, 162 Ariz. 187 [781 P.2d 1374]; *Globe Cab Co.* v. *Industrial Commission, supra*, 86 Ill.2d 354 [55 Ill.Dec. 928, 427 N.E.2d 48]; *White Top and Safeway Cab Co.* v. *Wright* (1965) 251 Miss. 830 [171 So.2d 510]; *Shinuald* v. *Mound City Yellow Cab Co.* (Mo.Ct.App. 1984) 666 S.W.2d 846; *Employers Ins.* v. *Greater Omaha Transp. Co.* (1981) 208 Neb. 276 [303 N.W.2d 282]; *Hannigan* v. *Goldfarb, supra*, 53 N.J.Super. 190 [147 A.2d 56]; *Ziegler* v. *Fillmore Car Service, Inc.* (1981) 83 A.D.2d 692 [442 N.Y.S.2d 276]; *Nesbit* v. *Powell* (Tenn. 1977) 558 S.W.2d 436; *Department of Labor* v. *Tacoma Yellow Cab Co.* (1982) 31 Wn.App. 117 [639 P.2d 843]; *Employment Sec. Comm'n* v. *Laramie Cabs* (Wyo. 1985) 700 P.2d 399.)

Another court has reached the same result on a narrower ground. (See *Worrell* v. *Yellow Cab Co.* (1978) 146 Ga.App. 748 [247 S.E.2d 569], appeal after remand *Yellow Cab Co.* v. *Worrell* (1980) 155 Ga.App. 41 [273 S.E.2d 410] [where ordinance restricted operation to permittee's employees and agents, cab company could not avoid compensation liability by delegating duties via lease].)

identified in *Borello*, when applied to the facts presented here, warrant the Board's determination that applicant was Yellow's employee for workers' compensation purposes.

## V. CONTROL

By statute, the question of control remains highly pertinent to the distinction between employees and independent contractors. (See § 3353.) Under *Borello*, however, the control test "must be applied with deference to the purposes of the protective legislation." (48 Cal.3d at p. 353.) The putative employer there presented evidence that it exercised no control over the actual performance of the work. The court noted, however, that the employer "exercised pervasive control over the operation as a whole"; it owned and cultivated the land for its own account; it supplied various instrumentalities in support of the work; the work involved no peculiar skill beyond that expected of any employee; it was this simplicity, rather than superior expertise, which made detailed supervision unnecessary; and productivity was adequately ensured by the piecework payment system. (48 Cal.3d at pp. 356-357.) "Under these circumstances," the court reasoned, "Borello retains all *necessary* control over the harvest portion of its operations. A business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers. [Citations.]" (48 Cal.3d at p. 357, italics in original.)

In determining the applicability of this reasoning to the present case, we first observe that the provisions of the lease agreement between applicant and Yellow do not distinguish *Borello* and are not persuasive evidence that Yellow lacked the requisite control. The "share farmers" in *Borello* signed a similar agreement, but the court deemed it ineffectual to create an independent contract relationship. (48 Cal.3d at pp. 346-347, 358-359, see *id.* at p. 351, fn. 5.) As the court observed, "The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." (*Borello, supra,* 48 Cal.3d at p. 349.) Even in the common law setting, a formal agreement characterizing the relationship as independent contractorship "will be ignored if the parties, by their actual conduct, act like 'employer-employee.' [Citations.] Indeed, the attempt to conceal employment by formal documents purporting to create other relationships [has] led the courts to disregard such terms whenever the acts and declarations of the parties are inconsistent therewith. [Citations.]" (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 877 [269 Cal.Rptr. 647].)

Despite its recital to the contrary, the lease here did not fully and accurately define the parties' relationship. Drivers had to pay $1 per shift for

insurance, in seeming conflict with lease provisions fixing the rental rate and requiring Yellow to furnish insurance. Although the lease is silent about working for other companies, applicant testified without contradiction that drivers were prohibited from doing so. And while the lease recites that drivers will be charged $10 per hour for late returns, applicant testified that they could either be terminated or charged for an entire additional shift if the cab was returned more than two hours late.

The actual conduct of the parties indicates that, by means both direct and indirect, Yellow controlled various aspects of the work. Applicant testified that the dispatchers "had control over [his] work" and that "he would get instructions on what to do such as to go to the airport or a hospital." As already noted, drivers were instructed on matters of behavior toward the public, personal appearance, and keeping their cabs clean. They were also given "advice as to how you should conduct yourself," including "general rules of good driving behavior."

Drivers were extensively controlled with respect to use of the radio. Applicant testified that if he refused one call from a dispatcher and another assignment was available, he could not go pick up that customer. This was apparently designed to coerce drivers into accepting assignments whether or not they found them profitable enough to deserve their attention. The evidence suggested other forms of direct control. If drivers violated the radio rules they could be "written up."

Dispatchers could demand that a driver return to the yard; applicant heard dispatchers saying "to bring it in right now or you're history"; and leases could be terminated if such instructions were refused. Leases could also be terminated based on write-ups or complaints by passengers. ▮▮▮ Liability to discharge for disobedience or misconduct is strong evidence of control. (See *Toyota Motor Sales U.S.A., Inc.* v. *Superior Court, supra*, 220 Cal.App.3d at p. 875.)

▮▮▮ Yellow exercised control over various other aspects of the relationship. Perhaps most significant was the prohibition on driving cabs for other companies. A mere lessor has no interest in restricting the lessee's freedom to render service to another. Nor is the paradigmatic independent contractor bound to serve one principal exclusively. By imposing such a restriction, Yellow exerted a form of control typical of employment and not of other relationships.

Yellow controlled drivers' hours by assigning shifts. Yellow imposed this control so that it could lease each cab to more than one driver in one day.

This practice resembled a paradigmatic employment relationship and significantly restricted applicant's independence.

As the foregoing evidence indicates, the parties' relationship contemplated more than the performance of their formal agreement. If Yellow were only contracting for the "particular result" set out in the lease, it would be concerned with little more than collecting rent and protecting the leased property. Instead, it had an obvious interest in the drivers' performance *as drivers*. To protect that interest, it treated them as employees.

Petitioners emphasize applicant's supposed independence under the lease and his testimony that he could go wherever he wanted with the cab, did not have to take radio calls, could run personal errands, and could use the cab to carry family members instead of paying passengers. Applicant testified that he did not have to show up for work at all, although failure to do so would cost him $56 a day.

This evidence has little weight as proof of independent contractorship. The work did not involve the kind of expertise which requires entrustment to an independent professional; it "is usually done without supervision whether the arrangement was lessee or employee, and the skill required on the job is such that it can be done by employees rather than specially skilled independent workmen." (*Employers Ins.* v. *Greater Omaha Transp. Co.*, *supra*, 303 N.W.2d at pp. 283-284; see *Borello*, *supra*, 48 Cal.3d at pp. 356-357 ["It is the simplicity of the work, not the harvesters' expertise, which makes detailed supervision and discipline unnecessary."].) Indeed applicant had enjoyed a similar degree of freedom as a unionized employee during the 1960's. Even then he could see a doctor, disregard a radio call, or arrange for his own customers. It is thus apparent that a good deal of freedom was "inherent in the nature of the work." (See *Toyota Motor Sales U.S.A., Inc.* v. *Superior Court*, *supra*, 220 Cal.App.3d at p. 875.)

Furthermore, to the extent applicant's freedom might appear to exceed that of a typical employee, it was largely illusory. If he wanted to earn a livelihood he had to work productively, and that meant carrying paying passengers. (See *Hannigan* v. *Goldfarb*, *supra*, 147 A.2d at p. 63 ["this alleged freedom not to work is fanciful. It is refuted by a simple economic fact—the driver's need to eat."]; *Borello*, *supra*, 48 Cal.3d at p. 357 [piecework payment formula ensured diligence and quality control].) There is no evidence that he could accomplish this without sacrificing his theoretical independence and subjecting himself to Yellow's control. (See *Hannigan* v. *Goldfarb*, *supra*, 147 A.2d at p. 63.)

In sum, Yellow exercised pervasive control over the enterprise as a whole; it exercised at least some direct control over applicant's work;

indirect control was effected through the payment system and the threat of termination; and such actual independence as applicant enjoyed was inherent in the work and was not the product of any specialized skill or expertise. It thus appears that Yellow exercised "all *necessary* control" over the work, and the test applied in *Borello* was satisfied here.

## VI. OTHER FACTORS

It appears that most of the other factors held to warrant a finding of employment in *Borello* have close parallels here. Like the "share farmers" there, the drivers here are "a regular and integrated portion" of the principal's business operation. (48 Cal.3d at p. 357; see *Central Management* v. *Industrial Com'n, supra,* 781 P.2d at p. 1378 [cabdriver's work was "not only an integral part" but "the essential core" of cab company's business]; *Local 777, Democratic U. Organizing Com.* v. *N. L. R. B., supra,* 603 F.2d 862, 898.) "*This permanent integration of the workers into the heart of* [*the*] *business is a strong indicator that* [*the principal*] *functions as an employer under the Act.*" (Borello, *supra,* 48 Cal.3d at p. 357, italics added.)

■ Petitioners seek to distinguish *Borello* on the ground that the leasing arrangement adopted here involved a reversal of the normal "flow of payment."[8] Certainly it is atypical for an employee to pay the employer. The manner of payment, however, is not a decisive test of employment. (*Burlingham* v. *Gray* (1943) 22 Cal.2d 87, 100 [137 P.2d 9].) One may be an employee for workers' compensation purposes even when the service is uncompensated. (See *Laeng* v. *Workmen's Comp. Appeals Bd., supra,* 6 Cal.3d at p. 777.) An employment relationship may also exist notwithstanding the presence of a "lease" or other arrangement calling for payments to the principal. (E.g., *S. A. Gerrard Co.* v. *Industrial Acc. Com.* (1941) 17 Cal.2d 411 [110 P.2d 377] [farmer under "lease" requiring $3,200 in rent was in effect owner's employee]; *Brose* v. *Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079 [228 Cal.Rptr. 620], review den. [triable issue presented whether newspaper carrier who paid for papers was publisher's employee for purposes of respondeat superior liability]; *Burlingham* v. *Gray, supra,* 22 Cal.2d 87 [same].) Furthermore, a "flow of payment" from worker to principal is also atypical of independent contractorship. This is therefore at most an equivocal consideration.

Petitioners suggest that the drivers' payments to Yellow created greater entrepreneurial risk and made the workers more like independent businesspersons than was the case in *Borello.*[9] The court there found little

---

[8] Petitioners incorrectly state that the workers in *Borello* were paid "directly by the employer." In fact the buyer issued checks which the grower handed out. (48 Cal.3d at p. 348.)

[9] Petitioners state that the workers in *Borello* were paid "a fixed rate for their production." In fact payment was determined by the buyer based on its own criteria. (48 Cal.3d at p. 346.)

entrepreneurial character in the work because the workers were paid according to the size and grade of their crop, they did not set the price, and the risk that the crop might be unharvestable was no different from the risk they would run if they were employees. (48 Cal.3d at pp. 357-358.) In the first two respects the cabdrivers' work here is closely analogous: drivers did not set their own rates but were paid according to the number and distance of fares they carried. The only risk they ran beyond that in *Borello* was that in the worst case they might lose money on a given shift. There was no evidence that this ever occurred; applicant testified that he averaged $82.50 per shift in earnings, after paying rent on the cab. In any event there is no basis for characterizing this risk as "entrepreneurial." There is no evidence that earnings varied with the drivers' skills, entrepreneurial or otherwise. The evidence on this point does not tip the balance far enough to warrant a result different from that in *Borello.*

Petitioners assert that whereas the workers in *Borello* supplied nothing but hand tools, the drivers here supplied the cabs. In *Toyota Motor Sales U.S.A., Inc.* v. *Superior Court, supra,* 220 Cal.App.3d 864, the court held that a pizza delivery driver appeared to be an employee of the pizzeria for respondeat superior purposes. The fact that he provided his own car, expenses, and insurance was described as "at most . . . a 'secondary element' and, without more, worthy of little weight." (*Id.* at p. 876.) Here the drivers did not provide their own cars, but paid for the privilege to use Yellow's. Except for gasoline and individual permits to operate, Yellow furnished everything: services (dispatching, towing, repair, and maintenance), liability insurance, and the requisite medallion. At most, therefore, the evidence on this point was equivocal.

Petitioners assert that applicant voluntarily assumed an independent and unprotected status, as indicated by his recognition that Yellow disclaimed any responsibility for workers' compensation, and his description of himself as "self-employed" to hospital personnel and taxing authorities. They also note that he was required to display a sign on or in the cab stating that he was a self-employed lessee.

■ The Supreme Court pointed out in *Borello* that the Workers' Compensation Act serves public as well as private interests and that a waiver of its protections is not to be lightly inferred. (48 Cal.3d at p. 358.) "Among other things, the statute represents society's recognition that if the financial risk of job injuries is not placed upon the businesses which produce them, it may fall upon the public treasury." (*Ibid.*) Where the principal offers no real choice of terms, but imposes a particular characterization of the relationship as a condition of employment, the workers' acquiescence in that

characterization does not by itself establish a forfeiture of the act's protections. (See *id.* at p. 359.)

 Applicant here did nothing more than the workers in *Borello* to waive the act's protections. He merely acquiesced in a characterization and purported forfeiture imposed as a condition of employment. The only apparent purpose of that condition was to achieve the very objective which the statute seeks to prevent—to place on injured workers and the public the inevitable costs of injuries generated by Yellow's enterprise.

When this matter was heard by the Board, it appeared that the public was going to absorb a great portion of the considerable costs of applicant's injuries. Given applicant's pretax earnings of $82.50 per shift, it is not surprising that personal health insurance and private disability coverage were "too expensive" for him. As of November 1988 he had spent 35 days in the hospital and had undergone 6 surgical procedures. He had received $10,000 in medical payments under the insurance policy on the cab. All other medical expenses were going to be absorbed either by the public hospital where he was treated, or by Medi-Cal. He was also receiving state disability payments and had applied for social security. But for the fortuity of his apparent settlement with a third party, acceptance of Yellow's contentions here would have made the public the ultimate insurer of this aspect of Yellow's enterprise.

We are satisfied that the analysis mandated under *Borello* amply supports the order under review. Accordingly, the writ heretofore issued is discharged.[10]

Newsom, J., and Stein, J., concurred.

---

[10] Applicant has requested an award of attorney's fees under section 5801. Under that statute we may impose fees on an employer who files a petition for review for which we find "no reasonable basis." Although we have rejected petitioners' contentions, we are not persuaded that the petition lacked a reasonable basis. Accordingly, the request for fees under section 5801 is denied.